THE STATE OF FLORIDA, COMPLAINANT, *v.* THE STATE OF GEORGIA.

In cases in which this court has original jurisdiction, the form of proceeding is not regulated by act of congress, but by the rules and orders of the court.

These rules and orders are framed in analogy to the practice in the English court of chancery.   But the court does not follow this practice, where it would embarrass the case by unnecessary technicality or defeat the purposes of justice.

There is no mode of proceeding by which the United States can bring into review the decision of this court upon a question of boundary between two States.   Justice therefore requires that the United States, which represent the rights and interests of the other twenty-nine States, should have an opportunity of being heard before the boundary is established.

The attorney-general having filed an information, stating that the interests of the United States are involved in the establishment of the boundary line between Florida and Georgia, he has a right to appear on behalf of the United States and adduce proofs in support of the boundary claimed by them to be the true one, and to be heard at the argument.

The United States will not, by this proceeding, become a party in the technical sense of the word, and no judgment will be entered for or against them.   But the evidence and arguments offered, in their behalf, will be considered by the court in deciding the matter in controversy.

Each party is at liberty to cause surveys and maps to be made.   But the court does not deem it advisable to appoint persons for this purpose.

In 11 How. 293, it is reported that the State of Florida filed a bill in this court, in the exercise of its original jurisdiction, against the State of Georgia to establish a boundary between them.   The State of Georgia answered, and other proceedings were had ; but the case was not yet at issue, nor was all the testimony taken upon which the parties proposed to rely.

At the present term, the attorney-general appeared in court and filed the following information, moving at the same time for leave to intervene on behalf of the United States for the reasons stated in the information.

Now, on this 15th day of December, 1854, Caleb Cushing, attorney-general of the United States, in his proper person comes here into the court, and for the said United States gives the court to understand and be informed, that a certain bill of com-

plaint is pending in said court, by or in behalf of the State of Florida, complainant, against the State of Georgia, defendant, wherein is in controversy a certain portion of the boundary line between said States, and of the lands contiguous thereto.

That by Mariano D. Papy, attorney-general of the State of Florida, formal notice in the name and behalf of said State has been given to the United States that the matter of said bill is of interest and concern to the said United States.

That, by inspection of said bill of complaint, it appears that the State of Florida alleges that the portion of boundary line in question should run, commencing at the junction of the Flint and Chattahoochee Rivers, and thence in a straight line to a point at or near a monument commonly called Ellicott's Mound, at the assumed head of the River St. Mary's, which line has been surveyed by the surveyors of the United States, and is known as McNeil's line, or howsoever otherwise the same may be described or designated.

That in said bill of complaint the State of Florida further alleges, that the State of Georgia pretends that, commencing at the junction of the Flint and Chattahoochee Rivers, as aforesaid, the said line should run to a point called Lake Spalding, or a point called Lake Randolph.

It further appears that the said points of Lake Spalding and Lake Randolph are situated about thirty miles to the south of said Ellicott's Mound, and the effect will be, if the pretence of the State of Georgia be sustained, to transfer to said State of Georgia a tract of land in the shape of a triangle, having a base of some thirty miles, and equal sides each of the length of about one hundred and fifty miles, comprehending upwards of one million two hundred thousand acres of land, which have been considered and treated heretofore as public domain of the United States, and surveyed as such, and much of which has accordingly been sold and patented by the government as of the territory of East Florida acquired from Spain.

And for the information of the court herein, the attorney-general files, annexed to this motion:—

1. A certified copy of the (cautionary) traverse line so surveyed in 1825, by said McNeil.

2. A certified copy of the field-notes of said traverse line so surveyed.

3. A certified copy of the map of the (cautionary) true line, plotted from traverse line, by said McNeil.

4. An official copy of diagram of surveyor-general of the United States for Florida, of surveys of public lands of United States in said State, to September 30, 1853.

Whereupon, and in consideration of the interest and concern

of the United States manifestly apparent in said bill of complaint, the said attorney-general of the United States prays the consideration of the court here, and moves the court that he be permitted to appear in said case, and be heard in behalf of the United States, in such time and form as the court shall order.

This motion was opposed by the States, and was argued by the *Attorney-General*, in behalf of the United States; by *Mr. Badger* and *Mr. Berrien*, on behalf of the State of Georgia, and by *Mr. Westcott* and *Mr. Johnson*, on behalf of the State of Florida.

Upon a question of this character, where " the file affords no precedent," the reporter would be pleased if he could report the arguments of counsel *in extenso;* but want of room compels him to submit to the reader only the following condensed and imperfect sketch of the respective arguments.

*Mr. Cushing* began with a general view of the subject of intervention, how it was considered in other countries, Spain, France, and England, and particularly the latter; and how far the English doctrines had been recognized in the United States. He then passed from the subject of intervention between private persons to cases where the attorney-general interfered, both in England and this country. He then considered the effect of the act of congress, (1 Stats. at Large, 93,) establishing the office of attorney-general, and making it his duty " to prosecute and conduct all suits in the supreme court in which the United States shall be concerned;" and contended that, if the government cannot be heard in this case by intervention, it cannot be heard at all.

His argument under the 15th and 16th heads is given entire.

15. If there were no precedents to justify the right claimed for the attorney-general, then the court should make one, in deference to the great principle of equity laid down by Lord Cottenham, in Taylor *v.* Salmon, that it is the duty of the court of chancery " to adapt its practice and course of proceeding, as far as possible, to the existing state of society, and to apply its jurisdiction to all those new cases which, from the progress daily making in the affairs of men, must continually arise ; and not, from too strict an adherence to forms and rules established under very different circumstances, decline to administer justice, and to enforce rights for which there is no other remedy." Taylor *v.* Salmon, 4 Mylne and Craig, 141.

This court has repeatedly decided that it has ample power to regulate chancery practice for the new and purely American question, of suits in equity between States; subject, of course, to the control of congress in this respect. Grayson *v.* State of

Virginia, 3 Dal. 320; Huger v. State of South Corolina, 3 Ib. 371; State of New York v. State of Connecticut, 4 Ib. 1; State of New Jersey v. State of New York, 5 Pet. 283; State of Rhode Island v. State of Massachusetts, 12 Pet. 657.

It can as well provide rules in equity, according to the exigencies of the case, for this first example of the more complex contingency of the collateral interest of the United States in a suit between two States, as it could for the primary and simple contingency of the suit between two States of itself.

If there be no rule in the files applicable to the case, then it is the very time for the court to exercise the double equity power, (reversing the order in which Bacon describes it,) *tam supplendi defectum legis quam subveniendi contra rigorem legis.*

16. It will not answer to say that the United States may appear in the name of the State of Florida.

§ 1. If so, then the condition of the United States, in the premises, is precarious, depending on the discretion of the State of Florida, or of any other State which may stand in like circumstances.

Self-defence on the part of the government will no longer be its right, but a favor to be granted or withheld by any litigant State. The essence of a right is, that it may be exercised contentiously, adversely. *Ubi jus ibi remedium.* Right is a thing determinate, fixed, established. *Rego, rectum, regula,* — all belong to the same set of ideas.

§ 2. The proposed appearance for the United States is not a volunteer act; for the State of Florida demands of the general government to intervene. The attorney-general of that State officially notifies the attorney-general of the United States of their interest depending on this question with Georgia.

But a case might arise in which neither of two or more litigant States desired the presence of the United States.

The matter before the court is, therefore, of a legal principle to be determined, not of a privilege to be conceded, or of one enjoyed indirectly, under favor of a State.

§ 3. Nor is the possibility of distinct and separate rights, on the part of the United States, a suggestion or supposition merely.

The United States have granted certain lands, by patent, to individuals, or by statute cession, to Florida, which, according to the claims of Georgia, belonged to her, not to the United States. Here is responsibility of the latter to its grantees.

The warrantor comes in because of his responsibility to his grantee, but also in order to see that the case is fully and well tried, with all just defences fully before the court, either technical or of the merits.

§ 4. The rights of the United States might be prejudiced in a suit between two States through the forms of law.

The constitution provides (Art. 1, § 3) as follows:—

" 3. New States may be admitted by the congress into this Union; but no new State shall be formed or erected within the jurisdiction of any other State; nor any State be formed by the junction of two or more States, or parts of States, without the consent of the legislatures of the States concerned, as well as of the congress."

By the constitution, also, (Art. 1, § 10,) " No State shall, without the consent of congress, . . . . enter into any agreement or compact with another State."

These two clauses of the constitution are *in pari materia*, and to be construed together; and they establish that two States cannot change their common boundary without consent of congress.

The United States have a general interest in the question of the boundaries of States, because of sundry political or legislative relations of the subject: as, for instance, apportionment of members of the house of representatives, collection districts, judicial districts, and many other things having reference to the boundaries of States.

Treaty rights may likewise be involved, as in the present case, where the line in dispute is defined by the treaty of 1783 between the United States and Great Britain, art. 2, (8 Stats. at Large, 81,) and by the treaty of 1795 between the United States and Spain, art. 2, (8 Ib. 140.) These treaties are a part of that supreme law, which it is the peculiar duty of the United States, its officers, and its tribunals, to maintain and execute.

Special acts of congress may be in question, as here in the present case.

By the act of March 3, 1845, for admitting the State of Florida into the Union, (5 Stats. at Large, 743, ch. 63, § 5,) " said State of Florida shall embrace the territories of East and West Florida, which, by the treaty of amity, settlement, and limits between the United States and Spain on the 22d day of February, 1819, were ceded to the United States."

And by the 7th section of that act, the State of Florida was admitted into the Union upon the express condition that the State shall never interfere with the primary disposal of the public lands within the State, nor levy any tax on the same whilst remaining the property of the United States.

The attorney-general, in proposing to intervene here to protect the interests of the United States, desires to do so, not as a tech-

nical party; not as joining with the one or the other party; not in·subordination to the mode of conducting the complaint or defence adopted by the one State or by the other, nor subject to the consequences of their acts, or of any possible mispleading, insufficient pleading, omission to plead, or admission or omission of fact by either or both; but free to coöperate with, or to oppose both, or either, and to bring forth all the points of the case according to his own judgment, whether as to the law or to the facts; for *ex facto oritur jus.*

As the States of Florida and Georgia cannot, by any direct agreement or contract between them, without the consent of congress, change the boundary of Florida, as established by the said act of congress, it follows that they ought not to be permitted to alter that boundary in the suit pending, either by possible mispleading, mistake in pleading, omission of pleading, or direct confession, or by omission of evidence, by any of which means the true, faithful, and full view of all the facts pertinent to the question might be withheld from the view and judgment of the court.

As the public domain and jurisdiction in East and West Florida, were acquired from Spain by the United States, and thereafter the territory so acquired by the United States was admitted into the Union with its boundaries so defined, and with the reservation to the United States of the disposal of the public lands, and that they be free of taxation by the State whilst they remain the property of the United States, the conclusion seems to be inevitable, (supposing this court to have original jurisdiction on the direct question of the primitive right of the boundaries,) that the attorney-general ought to be suffered to intervene fully and completely, to protect the interests of the United States, without being prejudiced by any acts or omissions of either of the litigant States, whether Florida or Georgia.

Otherwise, and without power to show the possible mistakes, errors, omissions, mispleadings, insufficient pleadings, and improper admissions or agreement of the two, or of the one or the other, the means of protecting the public interests would be wholly inadequate to the end; and two States might, by their own acts, by pleadings, or their agreement entered of record in the suit, change the true and lawfully established boundary between them to the direct prejudice of the interests, rights, and laws of the United States.

It is on this consideration, among others, that the whole doctrine of equity, as to the necessity of proper parties in court, stands. Each party interested is to defend his own rights, lawfully according to his view of their merits, without being

prejudiced through the acts or omissions of any co-party. See Story's Equity Pleadings, ch. 4.

§ 5. If the United States are not present, no decree in the case can be made to the prejudice of the United States.

*Mr. Badger* and *Mr. Berrien,* on behalf of the State of Georgia, opposed the motion, upon the following grounds, namely : —

The object of the motion, as appearing on its face and as explained by the brief of the attorney-general, is : That he, on the part and as the representative of the United States, may be made a party to this suit in fact, but not in form ; may exercise all the rights of a party without becoming a party ; may be, without seeming to be, a party.

On the part of the State of Georgia, it is insisted that the motion cannot be granted, because,

1. Under the constitution, this court has not and cannot have any jurisdiction of this cause, but as a controversy between States of the Union ; and the appearance of any other party therein would determine the jurisdiction and put the cause out of court.

2. To allow the United States to become in fact a party, without appearing on the record to be one, would be a mere evasion of the constitutional inhibition, involving all the guilt of a deliberate violation of that instrument, accompanied and enhanced by an artful contrivance to conceal it; a violation in substance though not in form, and therefore utterly unworthy of this high constitutional court.

3. If the motion should be granted, the United States would judicially appear on the record to be a party, though not made so by the process or in the manner usual in this court; and, therefore, the jurisdiction of the court would, at once, be gone.

4. There is no precedent or example of any such intervention as is here sought to be obtained.

We put aside all the references in the learned brief to proceedings under the civil law, as being utterly irrelevant to the question ; for that law neither gives the rule of judgment nor regulates the practice of this court. This cause is one of equity jurisdiction, governed, as to the principles of decision, by the law of courts of equity, and by the statutes and treaties of the United States, and as to the course of proceeding by the practice of the court of chancery in England, in subordination to the paramount authority of the rules of this court. If, therefore, it could be demonstrated that what the attorney-general asks is, and always has been, allowed as of right or of grace in all the courts of France, the German States, and other coun-

Florida *v.* Georgia.

tries of continental Europe, we should not be advanced one tittle towards showing the right or the propriety of allowing it to be done here.

In England, no intervention, whether voluntary or involuntary, if that term may be properly used in this connection, is known, except by the intervener becoming a party, and submitting his rights in the matters in dispute to the decision of the tribunal, so that its judgment shall conclude those rights. There, whatever may be the case in other European countries, no process has ever been applied or understood, in virtue of which one not a party to the record may interpose between two litigants, contest their rights or the rights of one of them, embarrass and obstruct their proceedings, direct or control their management of the controversy, and taking all the chances of obtaining a judgment against one of them, binding upon the rights of both, may retire at the conclusion of the contest with his own rights unaffected by a judgment adverse to his claims.

On the contrary, where third persons are found to have such an interest in the subject of litigation that they ought to be heard before a judgment, these persons are required to be made parties, to the intent that all persons in interest may be concluded by the final award of the tribunal. This is emphatically true in regard to equity proceedings in the court of chancery, and not less in regard to the crown than to private persons. This is abundantly evident from cases cited by the attorney-general in support of his motion. For example: —

(The counsel then cited and commented on the cases of Penn *v.* Baltimore, 1 Ves. Sen., 444; Hovenden *v.* Annesley, 2 Sch. and Lef. 607; Attorney-General *v.* Galway, 1 Molloy, which established that the king must be a party.)

5. The United States is not " concerned" in the questions involved in this cause, within the meaning of the act of congress prescribing the duties of the attorney-general; that term means, concerned in interest, and is exactly equivalent to " interested," and cannot be used in any other meaning in reference to an impersonal sovereignty like the United States. The cases cited show what is the nature of that interest of the king which makes it necessary in England that he should be a party; for example, a contest between two of his grantees claiming at rents of different value, where it appears upon record that the success of him who holds at the smaller rent will be immediately and certainly prejudicial to the crown revenue, and like cases.

Here no interest of the United States appears on the record. It is a question merely as to the boundary between two States. However resolved, the United States gains no right and suffers

41*

no loss, neither of the States holding under the United States as a tenant, or owing any payment or other duty to the United States, for or on account of her possession or jurisdiction. The only parties having any seeming interest in the question, besides the two States, are those having lands upon the disputed territory, whose titles may be, but are not necessarily, affected by a judgment against the plaintiff. The United States have no interest, real or apparent, and therefore are not a necessary or even a proper party to the controversy. The cases referred to by the attorney-general, in which the United States are represented by him officially in this court, are all consistent with the view here taken. Actions, for instance, brought in the name of heads of departments as such, are suits of the United States, as truly as an information in the name of the attorney-general, or the master of the crown office, is, in England, the king's suit, &c.

6. Supposing the United States to have some interest, indirect, consequential, and contingent, in the decision of the question in the cause, and supposing that in England such an interest of the crown might be represented by the attorney-general there, it doth not follow that the attorney-general here can assume, *virtute officii*, to represent such interest.

7. Even an act of congress could not enable him to intervene for the United States in this suit in this court. For, if made a party, either the court would proceed with a party, not a State before it, in which case, according to the constitution, this court cannot hold original cognizance, or dismiss the bill for want of jurisdiction; and thus a jurisdiction conferred by the constitution expressly and exclusively upon this court would be withdrawn from it by force of an act of congress, and in defiance of the constitution.

Upon the whole, it clearly appears that the court cannot grant the motion of the attorney-general.

What then remains to be done? If the United States have any consequential interest which ought to be represented, the court cannot, as did the lord chancellor in Reeve v. The Attorney-General, 2 Atkins, 223, dismiss the bill in order that proceedings might be taken in another court, for there is no such court; this court, and this only, having cognizance of the controversy between the two States; and the court cannot decline the exercise of its exclusive jurisdiction over the two principal parties, because of such incidental and subordinate interests.

We submit, as a necessary and inevitable consequence, that the court must proceed with the cause between the present parties, without intervention, formal or informal, of any third party whatever.

*Mr. Westcott* and *Mr. Johnson*, on behalf of the State of Florida, opposed the motion for the following reasons : —

1. That the jurisdiction of this court, in this case, is founded exclusively upon those clauses of the federal constitution which declare that "the judicial power of the United States shall extend" "to controversies between two or more States," in connection with that clause which provides that "in those cases (referring to the cases enumerated in the constitution, as being of federal judicial cognizance,) in which a State shall be a party, the supreme court shall have original jurisdiction."

2. That the clauses of the federal constitution cited, extending the federal "judicial power" "to controversies between two or more States," refer exclusively to cases in which States only are parties therein, and make such cases a distinct and separate class from all the other cases enumerated in the constitution; and they do not reach or apply to any case, whether at law or in equity, wherein there is a co-plaintiff or a co-defendant, other than a State, with a State or States; and if it be conceded that in a suit in equity, in this court, under any other of the constitutional provisions, a complainant hath a right to join the United States, or any corporation, or officer, or individual, interested in such suit, as a party complainant or defendant; or that the attorney-general of the United States hath authority to make the United States such party; or that this court possesses power to order the joinder as parties of all interested, as in an ordinary case in equity, in the English, or in our state chancery courts; it is nevertheless insisted by complainant, that in this "controversy between two States," such courses cannot be pursued; and this, though an act of congress allowing the same had been or should be passed.

3. That if the court should hold that the point secondly above stated is erroneous, and that the joinder of another party, not a State, with the State of Florida, as co-complainant, or with the State of Georgia, as co-defendant, would not affect the jurisdiction of this court over the present case, as invoked by the complainant in the bill filed, under the clauses of the federal constitution above cited, (and especially referred to in said bill,) then it is insisted that the complainant cannot, without an act of congress authorizing the same, make the United States a party to this bill; even if the consent of the attorney-general of the United States is given therefor ; and that, without such law, this court doth not possess the power to order, (either *ex mero motu*, or upon the express application of said attorney-general, or at the instance of either or both of the litigant States,) such joinder of the United States as a party complainant or party defendant in this case.

4. That insomuch as the United States, in the admission, by act of congress, of the Floridas, as a sovereign and independent State into the federal union, yielded to that State all rights of sovereignty or "eminent domain" they had within the boundaries of the States, as declared by the state constitution; and thereby became a mere proprietor of the unsold and ungranted lands included within said boundaries; they have not now any higher or other prerogatives, in reference to this "controversy," than a citizen or alien proprietor of land situate on the territory in dispute between the two litigant States, the titles of said proprietors of such lands being derived from the United States; and consequently, if the claim of the State of Georgia is sustained, will be destroyed; nor than the several thousand residents of said territory, who have, up to this time, been considered resident citizens of the State of Florida, and have exercised the rights, privileges, and immunities of such citizenship, and whose state allegiance will be changed by a decree of this court confirming the claim of the State of Georgia; and the complainant insists that the rights and interests of all said proprietors, (including the United States,) and of said residents, are, in this regard, entirely subordinate to those of the State of Florida, now in contest, and are subject to her action as their political sovereign in the premises.

5. That by reason of the anomalous character of a suit at law or in equity "between two or more (sovereign and independent) States," invol 'ing their rights of sovereignty, as well as of property; instituted in virtue of a federative compact, before a judicial tribunal, by legal process, summoning a defendant State to the bar of the court to submit her claims, and abide by the arbitrament and decree of that trib 58 al, from which decision there is no appeal; most of the rules or procedure in ordinary cases before the courts of common law or of chancery in England, are inapplicable to such suit, ineffective as aids to counsel in its prosecution or defence, and useless to the court in its investigation of the "controversy," or in its arbitrament and decision; and, by consequence, additional, different, and extraordinary *formulæ* of procedure, must be prescribed by the court, and conformed to by the parties, in every "controversy" before this court, "between two or more States."

6. That in the adoption of such necessary, additional, different, and extraordinary rules of procedure, "in controversies between two or more States," brought before this court, it is not restricted to guides furnished by the rules of procedure of the English common law or chancery tribunals, (wherein no like case is to be found;) nor, in the determination of such case, is this court limited to the consideration of the principles supplied

by the English systems of jurisprudence, to which such case is unknown, and the principles controlling it are above the reach and beyond the scope of those systems: and, therefore, whensoever a departure from English rules and theories will facilitate and speed the settlement of the controversy, will aid in the better protection of all just rights and interests involved, whether of the States who are the "parties," or of others not "parties," this court may rightfully invoke systems of jurisprudence and rules of procedure, in the tribunals of other countries, and with especial propriety resort to the principles and rules of the "civil law" of the continent of Europe, (the original source of much of the common law and most of the chancery law of England, but of more enlarged and liberal applicability;) or, this honorable court rightfully may, in a case so peculiarly and exclusively American, and its jurisdiction whereof is so entirely based on the constitutional compact between the States, devise, adopt, and enforce such original rules of procedure, appropriate to such case, as, in its judgment, may best tend to "establish justice," "insure domestic tranquillity," and promote the other declared objects of that compact; and this, though there cannot be cited any transatlantic precedent or example therefor.

7. That, as there are involved in this case not only the rights of sovereignty and of property, in controversy between the two litigant States, but also important rights and interests of others not parties in the record, founded on the identical facts and law to be submitted to the court, as the basis of its decree therein, all which rights and interests of those not parties will necessarily be affected if not conclusively determined by said decree; the complainant concedes the rightfulness and propriety of this court so devising the rules of procedure in this case, as to allow those immediately interested, though not parties, the privilege and opportunity of maintaining and defending their rights and interests, and of adducing proofs, and of being heard in argument before this court to that end; and that the same should be done in such liberal form and to such full extent as may be consistent with the progress of the cause, without embarrassment or prejudice to the parties, and as will not abridge or compromit the rights of the respective parties to the exclusive control and management of the mode and means of enforcing their own rights and interests; and the complainant also concedes, that insomuch as the title of the United States to some 1,200,000 acres of unsold and ungranted lands claimed to be what are usually designated as "public lands of the United States," of the estimated value of $1,200,000, and of which the United States are the constitutional trustees for the several States of the confederacy, and the people thereof; and, insomuch as the

liability of the federal treasury to refund large amounts paid into it as purchase-money, by patentees of the United States, for lands heretofore sold by the United States to them, and also to pay large sums for improvements and for damages, will be affected and in some respects determined conclusively, if the claim made by Georgia (suggested in the bill of complaint) be established by this court, which amounts and sums will probably exceed $1,500,000; this complainant, whilst she denies any special prerogative appertaining to the United States as a government, or any special privilege of the attorney-general of the United States, *virtute officii,* to interfere in this case, except as aforesaid; yet, because of all said premises above set forth, and especially for the reason that the United States cannot be made a party complainant or defendant in this case, doth concede that the rules of procedure so adopted by this court may rightfully and properly be extended in this case, as aforesaid, to the United States, and that the attorney-general may be allowed to "intervene," as he hath applied to the court, under such restrictions as above suggested by complainant, or such others as may be deemed proper by this honorable court.

8. That if it be held by this honorable court, that the complainant is in error as to the points above presented; and that the United States may be made a party complainant or a party defendant in this case, either without an act of congress therefor, or by authority of an act that may be passed therefor; and that such joinder is necessary for the protection of the admitted important rights and interests of the United States involved therein as aforesaid; then, this complainant respectfully insists, that if no act of congress be requisite to enable them to be made such party, this honorable court ought not to dismiss the said bill of complaint, for that the complainant did not join them as such party in said bill, but should stay proceedings and the decision in the case till the same be done, under an order of this court therefor; and if such act of congress be deemed proper and necessary, that a suggestion thereof be made in this case by this honorable court, in an order to stay proceedings in the case, until the executive and legislative departments of the federal government may be enabled to adopt such course in that behalf, upon the application of this complainant, as they may respectively deem advisable to that end or otherwise in the premises.

Mr. Chief Justice TANEY delivered the opinion of the court.

The court proceed to dispose of the motion made by the attorney-general for leave to be heard on behalf of the United States, in the suit between the State of Florida and the State of Georgia.

It appears that the boundary line between these two States is in controversy, and a bill has been filed in this court by the State of Florida to ascertain and establish it.

The attorney-general has filed an information, stating that the United States are interested in the settlement of this line; that the territory in dispute contains upwards of one million two hundred thousand acres of land, and was ceded to the United States by Spain as a part of Florida; and that the United States have caused the whole of it to be surveyed as public land, and sold a large portion of it, and issued patents to the purchasers. And upon these grounds he asks leave to offer proofs to establish the boundary claimed by the United States, and to be heard, in their behalf, on the argument.

The motion is resisted on the part of the States, and the question has been fully argued by counsel for the respective parties. And as it is, in some degree, a new question, and concerns rights and interests of so much importance, we have taken time to consider it.

If the motion was merely to be heard at the argument, there would, we presume, have been no opposition to it on the part of the States. For it is the familiar practice of the court to hear the attorney-general in suits between individuals, when he suggests that the public interests are involved in the decision. And he is heard, not as counsel for one of the parties on the record, but on behalf of the United States, and as representing their interests. This was done in several instances at the last term, where the United States had sold lands as a part of the public domain, which were claimed by individuals under grants alleged to have been made by France or Spain previous to the cession to this country.

In these cases, however, they were argued by the attorney-general upon the evidence produced by the respective parties. No new evidence was offered on behalf of the United States. And the objection now made is, that he cannot be permitted to adduce evidence in the case, unless the United States are parties on the record; and that they cannot, under the provisions of the constitution, become parties in this court, in the legal sense of the term, to a suit between two States.

We proceed to consider this objection.

The constitution confers on this court original jurisdiction in all cases affecting ambassadors, other public ministers, and consuls, and those in which a State shall be a party. And it is settled, by repeated decisions, that a question of boundary between States is within the jurisdiction thus conferred.

But the constitution prescribes no particular mode of proceeding, nor is there any act of congress upon the subject.

And at a very early period of the government a doubt arose whether the court could exercise its original jurisdiction without a previous act of congress regulating the process and mode of proceeding. But the court, upon much consideration, held, that although congress had undoubtedly the right to prescribe the process and mode of proceeding in such cases, as fully as in any other court, yet the omission to legislate on the subject could not deprive the court of the jurisdiction conferred; that it was a duty imposed upon the court; and in the absence of any legislation by congress, the court itself was authorized to prescribe its mode and form of proceeding, so as to accomplish the ends for which the jurisdiction was given.

There was no difficulty in exercising this power where individuals were parties; for the established forms and usages in courts of common law and equity would naturally be adopted. But these precedents could not govern a case where a sovereign State was a party defendant. Nor could the proceedings of the English chancery court, in a controversy about boundaries, between proprietary governments in this country, where the territory was subject to the authority of the English government, and the person of the proprietary subject to the authority of its courts, be adopted as a guide where sovereign States were litigating a question of boundary in a court of the United States. They furnished analogies, but nothing more. And it became, therefore, the duty of the court to mould its proceedings for itself, in a manner that would best attain the ends of justice, and enable it to exercise conveniently the power conferred. And in doing this, it was, without doubt, one of its first objects to disengage them from all unnecessary technicalities and niceties, and to conduct the proceedings in the simplest form in which the ends of justice could be attained.

It is upon this principle that the court appear to have acted in forming its proceedings where a State was a party defendant. The subject came before them in Grayson v. Virginia, 3 Dal. 320. And the court there said that they adopted, as a general rule, the custom and usage of courts of admiralty and equity, with a discretionary authority, however, to deviate from that rule where its application would be injurious or impracticable. And they at the same time passed an order directing process against a State to be served on the governor or chief magistrate, and the attorney-general of the State. This was in 1796. And the principle upon which its process was then framed, as well as the mode of service then prescribed, has been followed ever since, with this exception, that in subsequent cases the chancery practice, and not the admiralty, is regarded as furnishing the best analogy. But the power and

propriety of deviating from the ordinary chancery practice, when the purposes of justice require it, have been constantly recognized; and were distinctly asserted in the case of Rhode Island *v.* Massachusetts, 14 Pet. 247, and again in the same case, in 15 Pet. 273, and was recognized in the case of New Jersey *v.* New York, 5 Pet. 289.

We proceed to apply these principles to the case before us. It is manifest, if the facts stated in the suggestion of the attorney-general are supported by testimony, that the United States have a deep interest in the decision of this controversy. And if this case is decided adversely to their rights, they are without remedy, and there is no form of proceeding in which they could have that decision revised in this court or anywhere else. Justice, therefore, requires that they should be heard before their rights are concluded. And if this were a suit between individuals, in a court of equity, the ordinary practice of the court would require a person standing in the present position of the United States, to be made a party, and would not proceed to a final decree until he had an opportunity of being heard.

But it is said that they cannot, by the terms of the constitution, be made parties in an original proceeding in this court between States; that if they could, the attorney-general has no right to make them defendants without an act of congress to authorize it.

We do not, however, deem it necessary to examine or decide these questions. They presuppose that we are bound to follow the English chancery practice, and that the United States must be brought in as a party on the record, in the technical sense of the word, so that a judgment for or against them may be passed by the court. But, as we have already said, the court are not bound, in a case of this kind, to follow the rules and modes of proceeding in the English chancery, but will deviate from them where the purposes of justice require it, or the ends of justice can be more conveniently attained.

It is evident that this object can be more conveniently accomplished in the mode adopted by the attorney-general, than by following the English practice in cases where the government have an interest in the issue of the suit. In a case like the one now before us, there is no necessity for a judgment against the United States. For when the boundary in question shall be ascertained and determined by the judgment of the court, in the present suit, there is no possible mode by which that decision can be reviewed or reëxamined at the instance of the United States. They would therefore be as effectually concluded by the judgment as if they were parties

on the record, and a judgment entered against them. The case, then, is this: Here is a suit between two States, in relation to the true position of the boundary line which divides them. But there are twenty-nine other States, who are also interested in the adjustment of this boundary, whose interests are represented by the United States. Justice certainly requires that they should be heard before their rights are concluded by the judgment of the court. For their interests may be different from those of either of the litigating States. And it would hardly become this tribunal, intrusted with jurisdiction where sovereignties are concerned, and with the power to prescribe its own mode of proceeding, to do injustice rather than depart from English precedents. A suit in a court of justice between such parties, and upon such a question, is without example in the jurisprudence of any other country. It is a new case, and requires new modes of proceeding. And if, as has been urged in argument, the United States cannot, under the constitution, become a party to this suit, in the legal sense of that term, and the English mode of proceeding in analogous cases is therefore impracticable, it furnishes a conclusive argument for adopting the mode proposed. For otherwise there must be a failure of justice.

Indeed, unless the United States can be heard in some form or other in this suit, one of the great safeguards of the Union, provided in the constitution, would in effect be annulled.

By the 10th section of the 1st article of the constitution, no State can enter into any agreement or compact with another State, without the consent of congress. Now, a question of boundary between States is, in its nature, a politica question, to be settled by compact made by the political departments of the government. And if Florida and Georgia had, by negotiation and agreement, proceeded to adjust this boundary, any compact between them would have been null and void, without the assent of congress. This provision is obviously intended to guard the rights and interests of the other States, and to prevent any compact or agreement between any two States, which might affect injuriously the interest of the others. And the right and the duty to protect these interests is vested in the general government.

But, under our government, a boundary between two States may become a judicial question, to be decided in this court. And, when it assumes that form, the assent or dissent of the United States cannot influence the decision. The question is to be decided upon the evidence adduced to the court; and that decision, when pronounced, is conclusive upon the United States, as well as upon the States that are parties to the suit.

Now, as in a case of compact, it is, by the constitution, made the duty of the United States to examine into the subject, and to determine whether or not the boundary proposed to be fixed by the agreement is consistent with the interests of the other States of the Union; it would seem to be equally their duty to watch over these interests when they are in litigation in this court, and about to be finally decided. And, if such be their duty, it would seem to follow that there must be a corresponding right to adduce evidence and be heard, before the judgment is given. For this is the only mode in which they can guard the interests of the rest of the Union, when the boundary is to be adjusted by a suit in this court. For, if it be otherwise, the parties to the suit may, by admissions of facts and by agreements admitting or rejecting testimony, place a case before the court which would necessarily be decided according to their wishes, and the interest and rights of the rest of the Union excluded from the consideration of the court. The States might thus, in the form of an action, accomplish what the constitution prohibits them from doing directly by compact. Nor is this intervention of the United States derogatory to the dignity of the litigating States, or any impeachment of their good faith. It merely carries into effect a provision of the constitution, which was adopted by the States for their general safety; and, moreover, maintains that universal principle of justice and equity, which gives to every party, whose interest will be affected by the judgment, the right to be heard.

Upon the whole, we think the attorney-general may intervene in the manner he has adopted, and may file in the case the testimony referred to in the information, without making the United States a party, in the technical sense of the term; but he will have no right to interfere in the pleading, or evidence, or admissions of the States, or of either of them. And, when the case is ready for argument, the court will hear the attorney-general, as well as the counsel for the respective States; and, in deciding upon the true boundary line, will take into consideration all the evidence which may be offered by the United States, or either of the States. But the court do not regard the United States, in this mode of proceeding, as either plaintiff or defendant; and they are, therefore, not liable to a judgment against them, nor entitled to a judgment in their favor. We consider the attorney-general as the proper officer to represent the United States in this court; and that the general government, in bringing before us for consideration the rights and interest of the Union in the question to be decided, does nothing more than perform a duty imposed upon it by the constitution. And, as the mode in which that duty is to be per-

formed here is not regulated by law, but must depend upon the rules and regulations prescribed by the court, we shall not embarrass the proceedings by endeavoring to conform them strictly to English precedents and pleadings, and regard the mode in which the information on behalf of the United States has been presented, to be the simplest and best manner of bringing their interest before the court, and of enabling it to do justice to all parties whose rights are involved in the decision.

Mr. Justice McLEAN, Mr. Justice DANIEL, Mr. Justice CURTIS, and Mr. Justice CAMPBELL, dissented.

Mr. Justice CURTIS, dissenting.

It is in accordance with natural justice, and with a principle of jurisprudence, that no one should be affected by a judgment or decree, without an opportunity to present to the court, either by himself or his lawful representative, in some regular and legal course, his allegations and proofs, and to be heard thereon; and, therefore, I should have assented to the application of the attorney-general in this case, and would willingly concur with a majority of the court in the order they direct to be entered, if I did not find it to be subject to objections too grave for me to disregard, and which careful reflection, even under the influence of the great respect I feel for the opinions of my brethren, has not enabled me to overcome.

I will state, as briefly as I can, what these objections are. In doing so, I shall first examine the nature and effect of the application of the attorney-general, to see whether it is in the power of the court to grant it, as made; and I will then consider whether the order directed by the court is subject to the same difficulties, in part or in whole.

That application is, in substance, an *ex officio* information, in which the attorney-general of the United States informs this court of the pendency of a suit here, by the State of Florida against the State of Georgia, wherein there is in controversy a portion of the boundary line between those States; that it appears, from an inspection of the bill of the State of Florida, and of the answer of the State of Georgia, that, if the pretensions of the State of Georgia shall be sustained by this court, the boundary line in controversy will be so run as to include within the territorial limits of that State a tract of land of about one million two hundred thousand acres, which have been considered and treated heretofore as public domain of the United States, and surveyed as such, and much of which has been sold and granted by the United States, as being part of the territory of East Florida, acquired from Spain.

In support of this information, the attorney-general has filed certain documents and a map; and he prays that, in consideration of the interest and concern of the United States, he may be permitted to appear in the case, and be heard in behalf of the United States, in such time and form as the court shall order.

The case to which this information relates now stands on the original docket of this court, upon a bill filed by the State of Florida and an answer by the State of Georgia. No replication had been put in, and, of course, no proofs taken.

It is quite apparent, therefore, since the case is not now in a condition to be brought to a hearing, and since much time must necessarily elapse, considering the course of the court and the nature of the controversy and the character of the parties, before it can be put into a state to be heard, that this application of the attorney-general is not designed merely to obtain the privilege of taking part in the hearing of the cause, by making an argument at the bar, upon the pleading and proofs as they may exist when the cause may be set for a hearing, if that time shall ever arrive. It seems to me not consistent with that respect which is due to the attorney-general, to suppose that he has caused the States of Florida and Georgia, by their counsel, to appear here, and has called on the court to listen to and consider elaborate and learned arguments upon questions of constitutional law and general jurisprudence, merely to present the question whether — in the contingency that this case should, at some future day, be brought to a hearing, and in the event that, at that time, the interest of the United States should remain as it is now alleged to be — the court would hear the law officer of the United States, in support of its interests.

Courts of justice make orders and decrees upon actually existing states of fact, not upon what may possibly occur at some period in the future. And this obvious dictate of ordinary prudence is rigidly obeyed by courts of equity, when acting on subjects like that now before the court.

In England, the sovereign has a great number and variety of interests and rights, which may be affected by decrees of courts of equity. As will be more fully stated hereafter, the attorney-general represents the crown in respect of those rights, and no decree affecting them is made until he has had opportunity to become a party to the suit. But the question, whether he is a necessary party, is raised in the same way and at the same time, as the question whether a private person is a necessary party. And, I believe, we should search in vain for an instance in which any court had made an order in a cause before it was at issue,

42*

that, if it should come to a hearing, the attorney-general should be heard at the bar.

I have made these observations concerning the nature and objects of this application, because the information does not specify or in any way indicate what particular order it is desired the court should pass. If I felt at liberty to understand it simply as an application to be heard at the bar, by way of argument on the pleadings and proofs of the complainant and the defendant, I should think the proper answer would be, that the court would advise thereon when it was made reasonably certain that the cause would be heard. But I am not at liberty so to view this information, not only for the reasons I have suggested, but because the attorney-general, with becoming frankness, has declared, both orally, at the bar, and in his printed brief, that what he desires passes far beyond this. He has thus made known to the court that he seeks to intervene in the cause in behalf of the United States; and he has explained his understanding of the term intervention, and of the effect of an order of the court allowing it, to be, that he is to come into the cause, "not in subordination to the mode of conducting the complaint or defence adopted by one State or by the other, nor subject to the consequences of their acts, or of any possible mispleading, insufficient pleading, omission to plead, or admission or omission of fact, by either or both; but free to coöperate with or oppose either or both, and to bring forth all the points of the case according to his own judgment, whether as to the law or the facts; for *ex facto oritur jus.*"

Can this, or any thing like this, be allowed, consistently with the constitution and laws of the United States?

In answering this inquiry, it is necessary to determine what would be the relation of the United States to this controversy if the attorney-general were thus admitted. In my opinion, they would thus become substantially and really, a party to the controversy. I say substantially and really a party, for I quite agree with the majority of the court in thinking that this question is not to be decided according to any strict technical rules, or even viewed solely by the light which they impart. As I consider it, the question is one of constitutional law; and though the constitution was framed and intended to operate in connection with those systems of law and equity existing in our country at the time of its adoption, and many terms in it can be correctly understood only by resorting to the interpretation of those terms in those bodies of law, yet I concede that, in examining this question, we are to look to the substance and nature of the relation to the suit, and not merely to forms and names; and, therefore, I have inquired whether, if the attorney-

general be admitted on the record in accordance with the prayer of his information, the United States will be substantially and really a party to this suit? And, in the first place, I think there can be no substantial distinction in this matter between the United States and the attorney-general. If what is done is sufficient to make him a party, the United States is, in substance and in legal effect, a party. The rights and interests which he brings before the court are the rights and interests of the United States. He presents those rights and interests, not as a trustee in whom they are vested; not as specially empowered by law to sue in his own name for the recovery of something belonging to the government; but he acts simply as an attorney and counsellor at law.

The postmaster-general is empowered by law to bring suits in his own name, in the courts of the United States, upon contracts made with him as the head of a department; and the United States, though exclusively interested, is not deemed a party to the controversy. Osborn v. The Bank of the United States, 9 Wheat. 855. So an executor or administrator, though he may have no beneficial interest in the cause of action, is deemed the party to the suit for the purpose of jurisdiction. 4 Cranch, 308; 8 Wheat. 668; 12 Pet. 171. But, in these and similar cases the officer or executor has, by law, the legal right of action vested in him.

On the other hand, it has been repeatedly decided, that where a law required a bond to be taken in the name of a public officer, but for the benefit of individuals, as in case of sheriffs' bonds, the person for whose use the suit was brought, and not the obligee in whose name it was brought, was the party to the suit, within the meaning of the constitution. Brown et al. v. Strode, 5 Cranch, 303; McNutt v. Bland, 2 How. 1; Huff v. Hutchinson, 14 Ib. 586.

These decisions go much beyond what I maintain in this case. The rights and interests which the attorney-general desires to assert in this case are in no manner and for no purpose vested in him, any more than the rights and interests of the private parties litigating in court are vested in the attorneys and counsel whose names are on the docket, or who argue the causes at the bar.

He is not what was termed, in the cases of Browne et al. v. Strode, and the other cases just referred to, a conduit, through whom the remedy is afforded on a contract made in his name. He is simply a law officer of the government, empowered to act for the United States in this court. In such a case it does not seem to me to admit of a doubt, that whatever is done by him, though in his name, will be done by the United States.

Florida v. Georgia.

The case of Georgia v. Brailsford, 2 Dal. 402, was a bill by " His Excellency, Edward Telfair, Esquire, governor and commander-in-chief in and over the State of Georgia, in behalf of the said State." The jurisdiction was sustained, as of a suit by the State, and an injunction granted and a trial had at the bar of this court. 4 Dal. 1. Yet, to give the court jurisdiction, a State must be a party on the record. Osborne v. The Bank, 9 Wheat. 738. In this case, the court must have considered the State was made a party on the record by a proceeding in its behalf in the name of its chief executive magistrate. So it was declared by the court, in the case of The Governor of Georgia v. Madrazo, 1 Pet. 122; and in this last-mentioned case it was decided, on great consideration, and after examining all the previous decisions, that a claim filed by the governor of Georgia, in his own name as governor, but in behalf of that State, made the State itself a party to the record, within the meaning of the constitution and laws of the United States.

In Benton, District Attorney of the United States for the Northern District of New York, v. Woolsey et al. 12 Pet. 27, the district attorney of the United States for the northern district of New York had filed an information in his own name to foreclose a mortgage belonging to the United States. The case came to this court by appeal. In delivering the opinion of the court, Mr. Chief Justice Taney said: " Some doubts were at first entertained by the court, whether this proceeding could be sustained in the form adopted by the district attorney. It is a bill of information and complaint in the name of the district attorney, in behalf of the United States. But upon carefully examining the bill, it appears to be, in substance, a proceeding by the United States, although in form it is in the name of the officer. And we find that this form of proceeding in such cases has been for a long time used without objection in the courts of the United States, held in the State of New York; and was doubtless borrowed from the form used in analogous cases in the courts of the State, where the State itself was the plaintiff in the suit. No objection has been made to it, either in the court below or in this court, on the part of the defendants, and we think the United States may be considered as the real party, although, in form, it is the information and complaint of the district attorney. But although we have come to the conclusion that the proceeding is valid and ought to be sustained by the court, it is certainly desirable that the practice should be uniform in the courts of the United States; and that, in all suits where the United States are the real plaintiffs, the proceedings should be in their name, unless it is otherwise ordered by act of congress."

Now it is plain, that the only ground upon which this proceeding could be sustained, as within the jurisdiction of a court of the United States, was, that an information by a law officer of the government in his own name as such officer, but asserting rights of the United States, is a controversy to which the United States is a party within the meaning of those words in the constitution; for it was only because the United States was a party to the controversy that the jurisdiction attached. It would have been in conformity with what this decision declares to be the correct practice, if this information, and all proceedings which may ensue thereon, were to be in the name of the United States; but it is also in conformity with it to say, that though in the name of the attorney-general, for the United States, the United States will thereby be made a party to this controversy, provided what is done is sufficient to constitute any one a party to it. It remains to inquire whether the rights and privileges claimed by the attorney-general in behalf of the United States, if conceded, will make them a party to this controversy.

It seems to me somewhat difficult to reason about so plain a proposition. The attorney-general has already filed an information, alleging the interest of the United States, and showing what it is and how it arises. If an order is made thereon, allowing him to appear and support those allegations, the United States will appear on the record asserting their interest in this controversy. They will so appear, that they may enjoy the rights of a party to be heard by proper allegations and proofs, and by arguments at the bar. The process of the court must be accorded to them to obtain their proofs, in those modes and under those sanctions appropriated exclusively to the taking of evidence to be used in judicial controversies. They are to be at liberty to oppose the pretensions of the other parties, and to assert and maintain their own, in a regular course of judicature; and they, in common with the others, are to be bound by the decree, which is to be the product of their allegations, proofs, and arguments, as well as of those of the two States of Florida and Georgia.

If all this does not make the United States a party to this controversy, it would be difficult for me to show that it has any parties.

Under our system of jurisprudence, what constitutes a person a party to the record? Is it not sufficient, if it appears by the record that he had a direct interest in the subject-matter of the suit; that he placed before the court in his own name, and not in the name of another, by some appropriate allegations, his claim or defence; that he introduced legal evidence in support of that claim or defence, which was heard by the court; that he

was heard by his counsel; that his rights, and what he presented to the court in support of them, were taken into consideration by the court in making a decision; and that these rights were intended to be bound, and in point of law are bound, by the decree? All this must appear from this record, if the United States be allowed to do what has been prayed for.

The attorney-general, in his very learned and able argument, has referred the court not only to the practice of some of the courts of England, but to the Roman law, and to the modern civil law of the continent of Europe, concerning intervention. This practice differs, in details, in the different countries. But so far as I have been able to examine, a third person who comes in after the institution of a suit, to assert a right of his own involved in the controversy, is considered and expressly denominated a party. The definition given in the Code of Practice of Louisiana, which is substantially borrowed from the French Code of Procedure, is: " An intervention, or inter-pleader, is a demand by which a third person requires to be permitted to become a party in a suit between other persons, either by joining the plaintiff in claiming the same thing, or something connected with it, or by uniting with the defendant in resisting the claims of the plaintiff; or it may be lawful for him, where his interest requires it, to oppose both." See also Merlin, Rep. vol. 16, and Recueil, voc. Intervention, Dalloy Dic. s. vocc.

The English law is equally clear. When the attorney-general is brought into a suit between third persons as the representative of the crown, and to protect its rights, though possessed of some privileges which do not belong to private persons, he is not only called a party, but he is treated as one. He is attended with a copy of the bill, and if he does not appear it is considered as a *nihil dicit;* and if he does appear and fails to answer, the bill is taken *pro confesso* as against the crown. 1 Dan. Ch. Pr. 169, 170, 531, 548.

Indeed, I am not aware of any case, either in equity or admiralty, or at law, under particular statutes, in which a third person who intervenes, is not considered and called a party. The ground upon which a decree *in rem* is held to bind all persons, is, that every one having an interest has a right to make himself a party to the cause, and that the seizure or arrest of the thing gives notice to all concerned, of the pendency of the proceedings, and thus enables them to become parties. In Rose *v.* Himely, 4 Cranch, 277, Chief Justice Marshall states this familiar rule: " Those on board a vessel are supposed to represent all who are interested in it; and if placed in a situation which enables them to take notice of any proceedings against a vessel and cargo,

and enables them to assert the rights of the interested, the cause is considered as properly heard, and all concerned are parties to it."

And so in equity. Those who come in, even before the master, are, as Lord Redesdale says, (Mit. Pl. 178, 179,) considered parties to the cause in the subsequent proceedings.

With great respect for my brethren, I cannot agree that the reasons advanced by them why the United States will not be a party to the record are sufficient. Those reasons I understand to be, that no decree will be made against the United States, and that the attorney-general will not be allowed to interfere in any way with the pleadings, or proofs, of either the State of Florida or Georgia. As to the first of these reasons, it is certainly true, that no decree will be made against the United States, in form, or by name; but, if I understand the opinion of the majority of my brethren, they consider as I do, that substance, and not form, is to be looked to in this case; and that the only inducement for allowing the United States to be heard is, that, from the nature of the controversy, all the world must necessarily be precluded by the decree from disputing the correctness of the line of boundary fixed by it. Whether the United States shall or shall not be named in the decree, would seem, therefore, to be formal rather than substantial, since their rights and duties will be the same, whether named or not. In either case, the decree will conclusively operate thereon.

And as to the other reason, that the attorney-general is not to be allowed to interfere with the pleadings or evidence of the States of Florida or Georgia, I must say, with deference for the better opinion of my brethren, that it seems to me to be a restriction which, while it still leaves the United States a party to the suit, deprives them of some of the rights of a party, and to that extent fails to carry out the very principle which requires them to be heard at all.

The right to have this case stated by Florida in the bill, so as to present it in its entire substance, is a substantial and important right of the United States. If the case is defectively or untruly stated there, the decree must be affected thereby, for Georgia has the right to insist that the decree shall conform to the bill. An explicit and full answer to the bill is also material to the United States, that they may know what is to be relied on, and what proofs and arguments are necessary to be adduced. The power to cross-examine witnesses, and to except to proofs when offered, has been deemed essential to the administration of justice. I would respectfully ask, upon what principle known to our jurisprudence, are the United States to be deprived of these rights, if they are admitted at all to contest the claims of Georgia?

If both Florida and Georgia may cross-examine the witnesses of the United States, and except to their proofs, what intrinsic propriety or judicial reason can there be, why the latter may not cross-examine the witnesses and except to the proofs of the former?

With submission to a majority of my brethren, I confess it seems to me that to deprive a party of some rights which, under all systems of law known to us, are deemed essential, while other rights are allowed to him which can be conceded only to a party to the controversy, proves the embarrassment which was felt in carrying out the idea of making him a party, but does not overcome the difficulty or even avoid it. It appears to me to declare, in effect, justice requires that you should be admitted as a party on this record; but, in order to make some distinction between yourself and other parties, you shall not enjoy all the rights of a party; and the particular rights which you are not to enjoy are, the power of excepting to the pleadings and proofs of the other parties.

This is not satisfactory to my mind. Whether I consider only the substantial relations of the United States to the controversy, or the analogous provisions of positive or customary law in our own and other countries, I cannot avoid the conclusion that if they are admitted upon this record to assert their rights—to show what they are, and how they are involved in this controversy; to maintain them, in the regular course of judicature, by allegation, proof, and argument, against the State of Georgia; to have the process of the court to enable them to do so; to profit by the decree if favorable, to lose by it if adverse—they are a party to this controversy, within the meaning of the constitution of the United States. And this raises the question, which in my opinion is a very grave one, whether the constitution permits the United States to become a party to a controversy between two States, in this court?

The judicial power of the United States extends, among other things, to controversies to which the United States shall be a party—to controversies between two or more States—between a State and citizens of other States or of foreign states, where the State commences the suit, and between a State and foreign states.

In distributing this jurisdiction, the constitution has provided that, in all cases in which a State shall be a party, the supreme court shall have original jurisdiction. In all other cases before mentioned, the supreme court shall have appellate jurisdiction. One of the other cases before mentioned, is a controversy to which the United States is a party

I am not aware that any doubt has ever been entertained by

any one, that controversies to which the United States are a party, come under the appellate jurisdiction of this court in this distribution of jurisdiction by the constitution. Such is the clear meaning of the words of the constitution. So it was construed by the congress, in the judiciary act of 1789, which; by the 11th section, conferred on the circuit courts jurisdiction of cases in which the United States are plaintiffs, and so it has been administered to this day.

There was a case of the United States *v.* Yale Todd, commenced in this court in 1794, which is not reported, but it is stated from the record, by Mr. Chief Justice Taney, in a note to the case of the United States *v.* Ferreira, 13 How. 52. Of this case the note says: —

" The case of Yale Todd was docketed by consent in the supreme court, and the court appears to have been of opinion that the act of congress of 1793, directing the secretary of war and the attorney-general to take their opinion upon the question, gave them original jurisdiction. In the early days of the government, the right of congress to give original jurisdiction to the supreme court, in cases not enumerated in the constitution, was maintained by many jurists, and seems to have been entertained by the learned judges who decided Todd's case. But discussion and more mature examination has settled the question otherwise; and it has long been the established doctrine, and we believe now assented to by all who have examined the subject, that the original jurisdiction of this court is confined to the cases specified in the constitution, and that congress cannot enlarge it. In all other cases its power must be appellate."

The decision of this court, in Marbury *v.* Madison, 1 Cranch, 137, settled this construction of the constitution; and, as stated in this note, no one who has examined the subject now questions it.

We have, then, two rules given by the constitution. The one, that if a State be a party, this court shall have original jurisdiction; the other, that if the United States be a party, this court shall have only appellate jurisdiction. And we are as clearly prohibited from taking original jurisdiction of a controversy to which the United States is a party, as we are commanded to take it if a State be a party. Yet, when the United States shall have been admitted on this record to become a party to this controversy, both a State and the United States will be parties to the same controversy. And if each of these clauses of the constitution is to have its literal effect, the one would require and the other prohibit us from taking jurisdiction.

It is not to be admitted that there is any real conflict between these clauses of the constitution, and our plain duty is so to construe them that each may have its just and full effect. This is

attended with no real difficulty. When, after enumerating the several distinct classes of cases and controversies to which the judicial power of the United States shall extend, the constitution proceeds to distribute that power between the supreme and inferior courts, it must be understood as referring, throughout, to the classes of cases before enumerated, as distinct from each other.

And when it says: " in all cases in which a State shall be a party, the supreme court shall have original jurisdiction," it means, in all the cases before enumerated in which a State shall be a party. Indeed, it says so, in express terms, when it speaks of the other cases where appellate jurisdiction is given.

So that this original jurisdiction, which depends solely on the character of the parties, is confined to the cases in which are those enumerated parties, and those only.

It is true, this course of reasoning leads necessarily to the conclusion that the United States cannot be a party to a judicial controversy with a State in any court.

But this practical result is far from weakening my confidence in the correctness of the reasoning by which it has been arrived at. The constitution of the United States substituted a government acting on individuals, in place of a confederation which legislated for the States in their collective and sovereign capacities. The continued existence of the States, under a republican form of government, is made essential to the existence of the national government. And the fourth section of the fourth article of the constitution pledges the power of the nation to guarantee to every State a republican form of government; to protect each against invasion, and, on application of its legislature or executive, against domestic violence. This conservative duty of the whole towards each of its parts forms no exception to the general proposition, that the constitution confers on the United States powers to govern the people, and not the States.

There is, therefore, nothing in the general plan of the constitution, or in the nature and objects of the powers it confers, or in the relations between the general and state governments, to lead us to expect to find there a grant of power over judicial controversies between the government of the Union and the several States. On the contrary, the agency of courts to compel the States to obey laws of the Union, or to concede to the United States its rights or claims, would naturally be deemed both superfluous and impolitic; superfluous, because the States can act only through individuals, who are directly responsible, both civilly and criminally, to the laws of the United States, which are supreme, and in the courts of the United States, which have jurisdiction to enforce all laws of the United States; and

impolitic, because calculated to provoke irritation and resistance, and to excite jealousy and alarm.

It must be remembered, also, that a State can be sued only by its own consent.   This consent has been given in the constitution; but only in cases having such parties as are there described. The particular character of the parties to the controversy, into which a State has consented to enter, constitutes not only an essential element in that consent, but it is the sole description of what is agreed to.   The State of Georgia has consented to be sued by one or more States, or by foreign states, and by no other person or body politic.   The State of Georgia has consented to stand joined as a defendant with one or more States, or with a foreign state, and with citizens or subjects of a State other than the one bringing the suit, but with no other person or body politic.   Certainly, there is no power existing in this government to enlarge that consent so as to embrace in it any thing to which it does not, by its terms, extend.

I cannot agree that because the State of Georgia consented to be sued by the State of Florida, Georgia thereby consented to the introduction into the controversy of any party whose rights were so involved in the controversy that the court is bound, upon principles of natural justice, to have that party before the court, in order to make a decree.

In the first place, if it be conceded that a third party, not capable of suing a State, or being sued by one, is a necessary party to a controversy between two States, and that the court cannot make a decree without the presence of that party, it would seem to me to be the legitimate inference, that in such a case the States had not consented to be sued.   Having consented to be sued, in controversies having certain described parties, it would seem that a controversy which could not be carried on by them was not one to which the consent applies.

So far as I am aware, the other grants of judicial power by the constitution, which depend on the character of the parties, have been so construed.   Has it ever been supposed that into a suit between citizens of different States a third party not competent to sue or be sued, could come or be brought, because he was a necessary party, without whose presence a decree could not be made?   Has the doctrine ever been advanced, that when the constitution gave jurisdiction over suits between citizens of different States, it thereby, by implication, authorized that jurisdiction to be extended so as to embrace every person whose rights were so involved in the controversy that the principles of natural justice required him to be heard?

Take the case of a suit between a citizen of Florida and a citizen of Georgia, in the course of which it appears that an

inhabitant of this District, who is not competent to sue or capa-
ble of being sued, has such an interest in the controversy that
the court can make no decree between the parties before them
without affecting that interest; has it ever been supposed that
there was any implied power granted by the constitution and
the 11th section of the judiciary act of 1789 to make him a
party, or has the conclusion been that in all such cases the court
cannot act at all? The latter, I apprehend, is the settled con-
clusion. The forty-seventh rule for the equity practice of the
circuit courts provides, that if persons who might otherwise be
deemed necessary or proper parties to the suit cannot be made
so, because their joinder would oust the jurisdiction of the court,
as to the parties before the court, the court may, in its discretion,
proceed in the cause without making such persons parties; and
in such cases the decree shall be without prejudice to the rights
of the absent parties. This certainly assumes that there is no
implied power, arising out of the necessity of the case, to make
them parties, or to bring them into the cause so as to hear and
bind them without making them parties. The court is to
distribute all the justice it can between the parties over whom it
has jurisdiction; but if it can do nothing without the presence
of a necessary party, the remedy is not to bring him in, or allow
him to come in, but to refuse to act, and leave the parties to
terminate their dispute by other means. This is declared by
this court in Hagan *v.* Walker, 14 How. 36, and the earlier cases
lead to the same conclusion. Russell *v.* Clarke's Ex'rs, 7 Cr. 98;
Cameron *v.* Roberts, 3 Wheat. 591; Wormley *v.* Wormley, 8 Ib.
451; Carneal *v.* Banks, 10 Ib. 188; West *v.* Randall, 2 Mason,
195, 196; Shields et al. *v.* Barrow, *ante,* p. 130, of the present term.

It is true there is a class of cases in which this court has
decided that when the jurisdiction of the circuit court, by reason
of the character of the parties, has once attached, it is not de-
vested by one of the parties losing the character which entitled
him to sue, or subjected him to be sued in the circuit court, or
by his death and administration being granted to a citizen who
would not have been competent to sue; and further, that when
the judgment operated *in rem,* as in a suit in ejectment, no
change of the property, *pendente lite,* could prevent the circuit
court from exercising its jurisdiction over its own execution.
The cases of Morgan's Heirs *v.* Morgan, 2 Wheat. 297; Mollan
*v.* Torrance, 9 Ib. 537, are of the first class. It was there
held that a change of domicile did not defeat the jurisdiction
which had once attached. In the case of Clarke *v.* Mathewson,
12 Pet. 164, it was held that a bill of revivor was but a contin-
uation of the original suit, and that the jurisdiction having once
attached was complete, and continued to enable the court to

adjudicate on that subject-matter. In Dun v. Clarke, 8 Pet. 1, it was held that the circuit court had jurisdiction of a bill to enjoin the levy of an execution on a judgment in ejectment, though the land had been devised so that all parties were citizens of the same State.

This was upon the ground that the devisee of the land was to be deemed the mere representative of the plaintiff in the judgment, and that as to him the bill was not an original suit, but a proceeding on the equity side of the court to enable the court to control its own execution; and according to the case of Harris v. Hardeman, 14 How. 334, the same thing might have been done upon motion on the law side of the court. But the court refused to take jurisdiction over the other parties to the bill who had an interest in the land, or to decide the merits of the controversy, and confined itself to staying the execution of the judgment until the merits could be investigated in a suit in a state court.

It will be seen, I think, that none of these cases rest at all on the ground that there is jurisdiction, by implication, over a third party whose rights are such as to make his presence in the cause necessary. But if they did, they would fall far short of proving that such an implication can be made in this case. The constitution is merely silent concerning the introduction of a third person, not competent to sue or be sued in the courts of the Union, into a suit in the circuit courts; but it is not silent concerning controversies to which the United States is a party. It declares, in effect, that over such controversies this court shall not have original jurisdiction; for it makes its jurisdiction over such controversies appellate, and this, as has been long settled, excludes all original jurisdiction over such controversies, and even prevents congress from conferring it. Marbury v. Madison, 1 Cranch 137. To say that there is an implication that when the United States is a necessary party to an original suit in this court, they can become a party here, would be, in my opinion, not only an extension of the original jurisdiction of this court to a case not described by the constitution as within it, but to a party as to whom we are expressly forbidden to take such jurisdiction.

Nor do I find in the nature and circumstances of this case any such necessity for making the United States a party, as would lay a foundation for the presumption that it must be competent for the court, and consistent with the constitution and laws, to allow it to be done. This is not a broad question, whether in the exercise of the original jurisdiction of this court we are obliged to exclude all third parties, though they may have the most important rights and interests necessarily involved in the suit. I apprehend no such question arises here.

43 *

I do not doubt that in an original suit in equity here, between two States, or between a State and a foreign state, or between a State as complainant and individuals, or in a suit affecting ambassadors, other public ministers or consuls, any necessary party may be brought in who is competent to be sued by the plaintiff, or to sue the defendant in that suit in this court. Thus, a state may sue here other States, foreign states, all citizens of other States and of foreign states, and this I believe includes every possible party, except its own citizens and inhabitants of this District, and of the territories, and the United States. Setting aside residents of this District and of the territories, who cannot be deemed of great moment in this particular matter, and citizens of the State bringing the suit, whose rights the constitution evidently considers need no protection from this government, the practical effect of the doctrine I maintain will be found to be confined to the United States. They cannot be made a party to such a suit; and, in my judgment, it is in accordance with the whole plan of the government, as well as with the particular provisions of the constitution concerning the judicial power, that they should not be able to interpose and assume an adverse position to a State, in a judicial controversy in this court. Besides, I do not find in this case any real necessity to make the United States a party, according to the principles of equity law. A court of equity generally requires all persons who have an interest in a suit to be made parties. But it is a familiar rule, that when it is impracticable to bring before the court all interested, it is enough to make such parties as have a common interest with those who are absent. In such a case, the parties who are present represent the rights of those who are absent, and the court proceeds to make its decree, binding the rights of the absent parties, with the same confidence that justice is done as if they were before the court. Story's Eq. Pl. 97, 112.

Now, what is this case? The interest of Florida and that of the United States are identical. That interest is, to have the boundary line fixed as far to the northward as the proofs will allow. It is true, that what Florida seeks is the protection of its rightful jurisdiction as a sovereign State; and what the United States desire is the protection of its title as a landholder, and as the grantor of lands now held by their grantees. But both the political jurisdiction of Florida, and the title of the United States to land acquired from Spain, being coextensive with the territory of Florida, these two parties have a common interest in the subject-matter of this suit; and Florida is, in the contemplation of a court of equity, competent to represent the interest of the United States, as an owner of land.

Florida *v.* Georgia.

This would certainly be true in the case of individual parties, and in my opinion the same rule applies with still greater force to these parties. Florida is a sovereign State, whose suit must be conducted according to the will of its legislature. There is no room for any suspicion of any unworthy motives or conduct in its management. It is a high duty of that State, which it owes to itself, and which will doubtless be discharged to vindicate its jurisdictional rights, and make good its claims to all the territory which comes within its true limits. Though the question is merely where a line should be run, that line carries with it the sovereignty and territorial jurisdiction of States.

On the other hand, the United States is a landholder, whose title may be affected by running the line in one place rather than another. And so will the titles of hundreds of other landholders in this territory, whose interest is precisely the same as that of the United States, in kind, though not in amount. To say that it is necessary for the purposes of justice, that the United States, as the proprietor of lands, should be admitted into this suit to take care lest the State of Florida should omit something by way of pleading or evidence, seems to me to be yielding to an imaginary necessity only.

It is not alleged that the United States has any interest in this controversy except as an owner or grantor of land. Unquestionably there are political considerations, affecting the federal relations of the States, and connected with the extent of their territory, in reference to which the United States has a direct and important interest. This is not only obvious in itself, but is recognized by the constitution in various ways, and, amongst others, by the prohibition of the States to make any compact without the consent of the United States. But the object of this suit is not to change the limits or territory of States, but to ascertain their true and actual boundary; and in this question the United States has no interest, except that justice should be done; an interest which is not of a character to warrant the government in interposing in this case to assist in securing it, any more than in any other case pending in this court. It is suggested that the counsel for the two States may make agreements as to evidence, and other matters respecting the suit, and that the United States ought to be a party, in order to supervise such: but it seems to me that if this were a sufficient reason for making the United States a party in this case, it would apply to all cases between two States; for in all cases such arrangements are as likely to be made as in this one. But if such agreements of counsel, respecting the mode of conducting a suit between two States, could be deemed compacts between those States, within the restraining clause of the 10th

section of the first article of the constitution, congress, and not the attorney-general, or this court, must sanction them; and there does not seem to be any satisfactory reason why that officer should be connected with the subject. Any agreement fixing the line of boundary, made by the two States and not sanctioned by congress, would certainly not be executed by this court, which is to decree on the existing rights of the parties, and not upon new rights created by a compact, which is not valid without the assent of congress.

But, if the objection to the jurisdiction could be overcome, I should still be of opinion that the attorney-general as not authority to make the United States a party to a suit in this court. That officer possesses no powers derived from usage or implied from the name of his office. His powers are only coextensive with his duty; and that is defined by law to be, " to prosecute and conduct all suits in the supreme court in which the United States shall be concerned." 1 Stats. at Large, 93. It belongs to congress alone to decide in what cases the United States may be made a party in the courts, and to designate the officers by whom they may be made a party. This power congress has exercised. They have conferred upon the district attorneys power to prosecute all delinquents for crimes and offences cognizable under the authority of the United States, and all civil actions in which the United States shall be concerned. 1 Stats. at Large, 92. By the act of May 29, 1830, § 5, (4 Stats. at Large, 415,) the solicitor of the treasury is empowered to instruct the district attorneys in all matters and proceedings appertaining to suits in which the United States are a party, or interested; and by the 10th section of the same act, the attorney-general is to advise with and direct the solicitor. But no authority is conferred by any law, upon any officer, to make the United States a party to any suit, except as a plaintiff or prosecutor. If the United States be interested in a suit against an individual, and he thinks fit to allow the law officer of the United States to prosecute or defend in his name, I know of no objection to it, and it is very often done. It may be suggested, that as the line of boundary will be fixed by the final decree in this case, and as the rights of the United States will thereby be concluded, it can do them no injury, but may be beneficial to them, to be a party to this cause. If this be so, and the court has jurisdiction, it may afford sufficient reason why congress, in its discretion, should authorize an appearance by the attorney-general in behalf of the United States; but it does not enlarge the power of that officer, or enable him to do what, in my opinion, no law has conferred on him power to do,—to make the United States a party to an original suit in this court.

I am authorized to say that Mr. Justice M'Lean concurs in this opinion.

Mr. Justice CAMPBELL dissenting.

I dissent from the opinion of the court. The attorney-general suggests to the court that the State of Florida has filed here an original bill against the State of Georgia, for a settlement of the boundary between the States. He represents that the line claimed by Florida is that which the United States have recognized in the surveys, sales, and other operations of the land-office, and that the line of Georgia diminishes the domain of the United States in Florida twelve hundred thousand acres. " Whereupon, and in consideration of the interest and concern of the United States," he moves for leave " to appear in said cause, and be heard in behalf of the United States, in such time and form as the court will order." The condition of the cause, in relation to which the motion is made, is, that a bill and answer have been filed, but no issue exists, and none of the ulterior stages in the course of the cause attained; nor has there been any motion to the court requiring an examination of the record; and so the motion, as understood from its terms, is certainly premature. But the words, " to appear in said cause and be heard in behalf of the United States," very indifferently explain the significance of the motion. The application is, that the attorney-general may " intervene," " not as a technical party; not as joining with the one or other party; not in subordination to the mode of conducting the complaint or defence adopted by the one State or the other, nor subject to the consequences of their acts, or of any possible mispleading, insufficient pleading, omission to plead, or admission or omission of fact, by either party, or both; but to coöperate with or to oppose both or either, and to bring forth all the points of the case, according to his own judgment, whether as to the law or fact."

Though the pleadings show that the interests of the State of Florida and of the United States unite to maintain the same line, the attorney-general declines to adopt her suit, lest the condition of the United States might become " precarious," " depending on the discretion of Florida." Nor will the attorney-general file a bill for the United States, nor agree that Florida may make them defendants to hers, for, " that the court is not empowered by the constitution to entertain an original suit " of the kind.

Nor is the motive for this intervention merely that the United States have a fiscal interest, for the attorney-general suggests that the constitution may be violated by agreements and compacts of States, " entered of record," thereby altering the limits

of the States and the structure of the Union, "to the direct prejudice of the rights, interests, and laws of the United States." These suggestions of possible injustice arising from collusive compacts "entered of record," may be used in any judicial controversy between States, and in this case no evidence of such appears of record; and if such suggestions are heeded, the attorney-general must be constantly an applicant for leave to appear, "not as a technical party," but to employ some oversight, superintendence, or censorship, in suits between States of the Union in this court; and surely, such a claim requires new modes of proceeding, and that now proposed is as peculiar as the claim. The United States appear, with the assertion of their exemption from suit in this court—that the original jurisdiction of the court does not embrace them as a party. Thus declaring independence of process, pleading, and decree, in an original suit in the court, they ask to assist or to assail, at their pleasure, suitors legally before it, and to mould the decree in their case by allegations, evidence, and arguments, introduced without, and perhaps against, their will.

The principle of common law and chancery procedure is, that suits are commenced, prosecuted, and defended by parties to the record in their own names and the intervention of third persons, not parties, is unknown to the system; and we may affirm confidently, in a case like this, where the party is above and beyond the jurisdiction of the court, such a case is without a precedent. 2 Chitty's Pr. 343. The case of Pentland v. Quorrington, 3 My. and C. 249, was that of a trustee, with a full assignment, suing in the name of the assignor, under his power of attorney, and obtaining a decree with notice to the defendant. The nominal plaintiff agreed to an order for delay, and the trustee petitioned for a discharge of the order, and that he might conduct the suit. Lord Cottenham said: "It is a perfectly new equity. The only suit in court is a suit between the defendant and the party (assignor) with whom the contract was made. The plaintiff (assignor) is a party to the arrangement, for effectuating which the present order has been made. Your case is against him, that whereas he has authorized you to carry on this suit in his name, he has entered into the arrangement in question without your concurrence. If I were to make such an order, I should be giving you the right of carrying on this suit against the defendant; I should be displacing the plaintiff on the record." He asked: "Is there any instance of such an interference on the part of the court as you now ask?" The eminent solicitor answered: "I admit that I have never seen a case like the present." So in Drever v. Manderley, 4 M. and C. 94, an order allowing a third person to control a suit where the subject

belonged to him by assignment, but to which he was not a party by any proceeding, was pronounced by the same chancellor "perfectly irregular." The court did not object to the right to the subject of the suit, but to the mode of enforcing the right, by the attempt to control the suit. It required the assignee to exhibit his right by bill, according to the practice of the court, in his own name.

Chief Justice Marshall, in describing the controversies to which the judicial power of the United States extends, says: —

" The words are of well understood and limited signification. It is a controversy between parties which had taken a shape for judicial decision." " To come within the description of a case in law and equity, a question must assume a legal form for forensic litigation and judicial decision. There must be parties come into court who can be reached by its process and bound by its power, whose rights admit of ultimate decision by a tribunal to which they are bound to submit." 5 Wheat. Ap. 16, 17. The supposed cases of exception cited by the attorney-general only display the pervading extent of this principle. The instances quoted are rules under the interpleading act of Wm. IV.; landlords defending for tenants in ejectment, vouchees in warranty in real actions, bills of interpleader, and suits by representative parties, for or against themselves and others. The cases referred to in courts of common law arise, where a person having the primary right or obligation, is called as a party to the suit to defend that right or to fulfil the obligation; and Lord Coke speaks of the common law instance of a vouchee as. " seeming strange " and depending upon " ancient, continual, and constant allowance," (2 Ins. 241;) and so, in interpleading suits, parties having an adverse interest are called in by process, as parties, to disengage a neutral who may have the subject of controversy and desires to relinquish it to the owner, when he shall be ascertained, and in representative cases the court acts upon the parties to the record, and determines the case made by them. In this case, the United States admit no representation on their behalf; nor will they undertake the suit of either, nor admit the jurisdiction of the court to treat them as a suitor or party; but contest the authority of the court, are ready to contest or strengthen the positions of either party, and thus they seek, by an anomalous Austrian intervention, to overlook and control the proceedings of the litigants to their own aggrandizement. I find no precedent in the direct and straightforward course of the common law, nor in the statutes altering it, for such a conduct. I will briefly examine the precedents to which we have been cited, in the codes of procedure of those tribunals which apply the jurisprudence of imperial or

pápal Rome. The French code permits the interposition of third persons in existing suits. An intervenor may guard a present or future interest, or one certain, contingent, conditional, or collateral, whether pecuniary or personal or held as a representative. But the inquiry is, how and under what circumstances ? And the answer is, by propounding his pretensions to the court as a suitor, inviting contest, alleging proofs, recognizing the jurisdiction of the court, and submitting to its decree. 4 Bioche Dic. de Pro. 590; Louisa. Code, Prac. § 324.

La Cañada, describing the Spanish system, says, there are necessarily two parties to every suit (*actor* and *reo*) ; and when a third litigant comes, he is called by that number (*tercero*) ; and because he can oppose either of the parties, or both, the word opposer is added (*tercero opositor*), and his act is called third opposition. If he comes to aid another party in the same right, he accepts the suit as he finds it, and acts conjointly ; if his rights are independent, adverse, or paramount, his suit is treated as an original suit, and is conducted as ordinary suits.

The third opposer is technically a party to the cause, and really subject to the decree. La Cañada, Juicos Civiles, 393.

Nor do the admiralty or ecclesiastical codes afford any sanction to the motion. Their jurisdiction being largely *in rem*, they allow persons who have a present and certain claim to the *res*, to propound their interest, if the court has jurisdiction ; and by the act the persons become parties to the suit, liable for costs and entitled to appeal. The various codes, then, differ in the time and manner of calling parties before the court. The conditions of a suit at the common law, in general, are settled at its institution, and new and independent parties are not introduced in the subsequent stages. The courts of chancery are more liberal in reference to the time of making parties and in the extent of their amendments. But in both courts the plaintiff is the *dominus litis*, and third persons may not come in unless he amends the proceedings, or his bill is fitted for it, as being a representative bill. But in the civil, admiralty, and ecclesiastical courts, the power of third persons to propound their rights in the subject of dispute is not so dependent upon the will of the prior parties. But all the codes of procedure unite in this, that persons must come in according to a regular course of procedure, accepting the authority of the court, citing adverse parties to defend, and yielding to whatever decree it may pronounce. The more than imperial claim, in this instance, is for all the faculties of a suitor, without a submission to the obligations and restrictions of one. But it is supposed that precedents in the English chancery support a pretension of the attorney-general to intervene according to his motion.

Florida *v.* Georgia.

An important class of the rights of the crown are represented there by the queen's attorney-general; but how? He is introduced upon the record as a "technical" party to the suit, and the crown is bound by the decree. When the right is adverse to the plaintiff, the attorney-general is made a party by prayer in the bill and the service of a copy. If he fails to appear, it is a *nil dicit;* and if he appears and will not answer, a decree *pro confesso* is taken. Danl. Ch. Pr. 175, 501, 548 ; Dick. 729 ; 1 Y. and J. 509.

And courts there exercise over the attorney-general the same authority which they exercise over every other suitor, and he would not be permitted more than any other suitor to prosecute any proceeding merely vexatious, or which had no legal object. The Queen *v.* Prosser, 11 Beav. 306.

The cases cited, of Penn *v.* Lord Baltimore, Hovenden *v.* Annesly, Attorney-General *v.* Galway, and the analogous cases of Dolder *v.* Bank of England, and Burgess *v.* Wheat, (Cas. temp. Hard. 332 ; 2 Sch. and Lef. 617 ; 1 Moll. 95 ; 10 Ves. 352 ; 1 Eden. Ch. 177,) are instances of the application of the rule that the court will require the crown to be made a party to the record, under the name of the attorney-general, and that he comes as an actual and obedient party, and not in any illusory and indeterminate form ; so that, if the claim of the attorney-general to represent the United States in courts, to the extent claimed, is tenable, the manner of the intervention here is inadmissible.

But I do not admit that the attorney-general has any corporate or juridical character, or that he can be introduced upon the record, in his official name, as an actor or respondent in a suit. His duties are strictly professional duties, and his powers those of an attorney at law. Whatever he may do for the United States, a special attorney might be retained to do ; nor can the United States appear in his name, nor by his agency, in cases where they may not be a party.

I have considered this motion upon the concessions of the argument, but the principle lying at the foundation of the case should not form the basis of a judgment merely on the strength of such concessions ; and hence I proceed to its examination.

The judicial power of the United States extends to all cases in law and equity arising under the constitution and laws of the United States, and treaties made under their authority ; to all cases affecting ambassadors, other public ministers, and consuls ; to controversies to which the United States shall be a party ; to controversies between two or more States ; and between a State or the citizens thereof and foreign states, citizens, and subjects.

" In all cases affecting ambassadors, &c., and those in which a State shall be a party, the supreme court shall have original jurisdiction. In all other cases before mentioned the supreme court shall have appellate jurisdiction only." It was not in the design of the constitution to alter or even to modify the existing relations of any of the sovereign parties named in this article, to legal jurisdictions, by enlarging their liableness to suit; but its purpose was to erect tribunals to which they might resort for the determination of the suits which they might legally commence, or might voluntarily submit or were subject to, according to their preëxisting conditions. Thus, no suit can be commenced against the United States, foreign states or ambassadors, and public ministers; nor are they brought within the jurisdiction of the courts of the United States to any degree beyond that to which they were liable, without this constitutional clause. The construction which allows the exemption of these parties as sovereigns, or their representatives, to operate, sanctions, also, the title of the States to the same right, for they are mentioned in the same clause; and the jurisdiction conceded to this court, in reference to them, is expressed in similar or identical language.

I am aware, that at an early day in the existence of this court, a contrary opinion was expressed by a majority, upon a motion for an interlocutory order in a suit against a State, and I propose to examine the principle established in the controversy, of which that opinion is a part.

While the constitution was under discussion, General Hamilton (Federalist, 81) said, " that it is in the nature of sovereignty not to be amenable to the suit of an individual without its consent," and contended, " that to ascribe to the federal courts, by mere implication, and in destruction of a preëxisting right of the state governments, a power which would involve such consequences, would be altogether forced and unwarrantable." So, Mr. Madison, replying to the vehement and prophetic denunciations of Patrick Henry, in a careful exposition of the judiciary clause, calmed the Virginia convention by assuring it that " it is not in the power of individuals to call any State into court. The only operation the clause can have is, that if a State should wish to bring a suit against a citizen, it must be brought in the federal court." And the late Chief Justice Marshall supported him, saying: " With respect to disputes between a State and citizens of another State, its jurisdiction has been decried with unusual vehemence. I hope no gentleman will think a State will be called at the bar of a federal court. It is not rational to suppose that the sovereign power shall be dragged before a court. The intent is to enable

States to recover claims of individuals residing in other States. I contend this construction is warranted by the words." Virginia Deb. 387, 405, 406.

When these assurances from the most accredited friends of the new government were disappointed, by the institution of suits in this court against several of the States, by individual plaintiffs, shortly after the adoption of the constitution, a strong sentiment of wrong was felt, and corresponding indignation expressed. This indignation was not occasioned by any apprehension of consequences to the States as debtors, but by the fact that they supposed their rights to be violated. The history will bear no other interpretation. In Chisolm *v.* Georgia, that State instructed counsel to present to the court a written remonstrance and protestation against the exercise of jurisdiction, but not to argue the cause. The attorney-general opened the case of the plaintiff by saying: " He did not want the remonstrance of Georgia, to satisfy him that the motion for judgment was unpopular. Before that remonstrance was read, he had learned from the acts of another State that she too condemned it." The court awarded a writ of inquiry upon the default of the State, sustaining the jurisdiction upon arguments of the utility, justice, and safety of the delegation of the power, and of the diminution and abasement wrought upon the States by the constitution. Mr. Justice Wilson states the case " as one of uncommon magnitude." He says: " One of the parties is a State, certainly respectable, claiming to be, sovereign. The question to be determined is, whether this State, so respectable, and whose claim soars so high, is amenable to the jurisdiction of the supreme court of the United States? This question, important in itself, will depend on others more important still; and may perhaps be ultimately resolved into one no less radical than this : Do the people of the United States form a nation?" It is not difficult to perceive the profound misconception of the relations of the States to the Union which dictated his judgment. The following year the legislature of the Commonwealth of Virginia adopted a resolution which contains a reply to the question: " Resolved unanimously, that a State cannot, under the constitution of the United States, be made a defendant at the suit of any individual or individuals ; and that the decision of the supreme federal court, that a State may be placed in that situation, is incompatible with and dangerous to the sovereignty and independence of the individual States, as the same tends to a general consolidation of these confederated republics;" and instructed their senators and representatives " to unite their utmost and earliest exertions to obtain such amendments as will remove or explain any clause which can be construed to imply

or justify a decision that a State is compellable to answer in any suit by any individual or individuals in any court of the United States."

One month after, January, 1794, the senate was moved by Mr. Strong, of Massachusetts, to adopt the eleventh amendment to the constitution, declaring that the constitution should not be construed to authorize such suits. Various attempts were made in both branches of congress to limit the operation of the amendment, but without effect. It was accepted without the alteration of a letter, by a vote of 23 to 2 in the senate, and 81 to 9 in the house of representatives, and received the assent of the state legislatures. Georgia ratified the amendment as " an explanatory article," her legislature " concurring therewith, deeming the same to be the only just and true construction of the judicial power by which the rights and dignity of the several States can be effectively secured." Thus the supreme constitutional jurisdiction of the United States, the concurrent action of congress, and the state legislatures, expressing a consent nearly unanimous, corrected the opinion of the supreme court, and intercepted its final judgments in these cases, by declaring that the constitution should not be so construed as to allow them.

The reporter of the court closes the volume which contains the case of Chisolm, by saying " the writ of inquiry was not sued out and executed; so that this cause and all other suits against States were swept at once from the records of the court by the amendment of the constitution." The course of argument which excluded the jurisdiction of such cases, applies with equal force to suits by foreign states against the States of the Union. And the considerations which forbid suits against the States by individuals, indicated with such clearness in the Federalist, form the basis of the luminous and masterly judgments in the English chancery, in the case of the Duke of Brunswick *v.* King of Hanover, 6 Beav. 1; 2 H. L. Ca. 1, where the delicacy, difficulty, and danger of the jurisdiction, and its want of practical value, are fully set forth, and the conclusion announced " that it is a general rule, in accordance with the laws of nations that a sovereign prince resident in the dominions of another is exempt from the jurisdiction of the courts there." It is clear the constitution did not abrogate any law of nations, and the only question is whether the States consented to suits without any reciprocal right, or whether the existence of such a power in foreign states could possibly assist any objects of the confederacy. On the contrary, would not such a promiscuous grant jeopard its tranquillity and peace ? The answer of Mr. Madison to the Virginia convention is positive and direct. " I do not

conceive," he says, " that any controversy can ever be decided in these courts, between an American and foreign state, without the consent of parties. If they consent, provision is here made. The disputes ought to be tried by the national tribunal. This is consonant with the law of nations." Virginia Deb. 391. To this consent, it may be that congress would be a necessary party.

The nature of the jurisdiction in regard to the States having been considered, the inquiry can now be made, can the United States be a party to a suit between two or more States? The constitution does not mention such a case. There were before the federal convention propositions to extend the judicial-powers to questions " which involve the national peace and harmony;" " to controversies between the United States and an individual State;" and in the modified form, " to examine into and decide upon the claims of the United States and an individual State to territory." None were incorporated into the constitution, and the last was peremptorily rejected. The jurisdiction of this court over cases to which the United States and the States are respectively parties, is materially different — the one original, the other appellate only. There was no encouragement, nor serious countenance, to the proposition to vest this court with jurisdiction of such cases. This court is organized and its members appointed by one of the parties. Their influence extends with the jurisdiction of this court, their means of reputation with its powers, their habitual connection with the federal legislation naturally inspires a sentiment in favor of the federal authority. These operative causes of bias were known; and apprehensive as the States were of consolidation and the overbearing influence of the central government, we can well understand why only the modified proposal as to jurisdiction was pressed to a vote. I repeat, that the enumeration of the parties in this article of the constitution did not enlarge the liabilities of the States to suits, but it only provided tribunals where suits might be brought, to which they were already subject, or might desire to commence. Nor does the clause authorizing suits between two or more States afford any contradiction to this conclusion.

The articles of confederation, by which they were then combined, allowed congress, as the occasion might arise, to appoint special tribunals " to which all disputes and differences now subsisting, or that might hereafter arise, between two or more States, concerning boundary, jurisdiction, or any other cause whatever," should be submitted.

Similar provisions for special and occasional tribunals, in matters of jurisdiction and boundary, formed a part of the plan of the constitution till near the close of the convention: when

44 *

they were stricken out, and the general jurisdiction over those as well as other controversies delegated to this court. My conclusion, after an examination of the clause, is, that it is only in controversies between the States that one of their number can be impleaded in this court without its explicit consent; and that this jurisdiction is special, as to the controversy and the parties, embracing none except those between the States of the Union; that the court has no original jurisdiction of the United States, and none of a controversy between them and an individual State; and consequently, that they have no title to appear as a party to the record, nor in any undefined and uncertain relation to it.

And now the question arises, whether the United States can or ought to be concluded as to their property, without a privilege to appear and be heard, by a judgment of the court, upon a question of boundary submitted by two or more of the States, for its adjudication?

Without assigning any effect to the judgment that may be rendered, or anticipating whether the rights of the United States may be reserved, I will assume that the United States will be estopped by the judgment, and that no reservation of their proprietary rights can be made; and consider whether, under such circumstances, there is injustice. The government of Florida involve in this suit her highest claims—those of sovereignty and jurisdiction—and fulfil their chief political obligations in its prosecution. If individual claims are affected by the decree in such a suit, it is because they are so incorporated in the rights of their sovereign as to have no separate or independent existence. She is the representative of all the proprietary rights and interests of her people in their contest with another sovereign. The United States, in resigning their sovereignty over the territory of Florida to the people, and by recognizing their government, relinquished their authority over this controversy, and consented that their proprietary claims to the waste and unappropriated lands should abide the issue to which the State, in her wisdom and fidelity, should attain. This sovereign control of Florida was modified upon her accession to the Union. After this, if the controversy was settled by negotiation and compact, the consent of congress was necessary to its binding operation, as in other cases of compact. If it was settled contradictorily, then this tribunal was appointed to make the determination.

Nor do I perceive that the executive department has any title to disturb the parties or the court, with the expression of anxieties or apprehensions that this court will be lured to perform what congress alone may do, or that these constitutional condi-

tions will not be honorably fulfilled. The existence of this federal government, in its whole extent, is a testimonial to the magnanimous and disinterested polity of the States of the Union; nor is the concession, which submits to a tribunal of justice the peaceful and rational adjustment of the controversies between sovereign States, the least weighty of the proofs of those dispositions. It seems to me, that it is the duty of this court to come to the exercise of the jurisdiction the States have conferred, in the same spirit; to exercise it according to the letter of their submission; to exclude from it suspicion, jealousies, interventions from any authority, but to meet the parties to the controversy with confidence.

Dissenting from every part of the order, I have filed the reasons for the dissent.

### *Order.*

Ordered, that the attorney-general have leave to adduce evidence, either written or parol, and to examine witnesses and file their depositions, in order to establish the boundary claimed by the United States.

After the motion of the *Attorney-General* for leave to intervene in this suit had been decided, *Mr. Westcott* and *Mr. Johnson*, on behalf of the State of Florida, moved for leave to take out commissions to examine witnesses in the case, and for sundry orders to expedite the case and prepare it for trial.

Among the orders moved for was the following: —

" That (the consent of the State of Florida being hereby given thereto) the attorney-general of the United States may, in behalf of the United States, use the name of said complainant whenever he may deem it advisable that the United States should sue out any commission, to take any testimony or procure any proofs in said cause; he giving notice thereof to the solicitors or counsel for said parties, as aforesaid."

This part of the motion was opposed by the counsel for the State of Georgia; and, in behalf of that State, a motion was made to appoint a commissioner and surveyor to survey the premises in dispute, and take testimony and report to the court; the motion stating particularly how the duty was to be performed. This motion was opposed by the counsel for the State of Florida.

The questions were argued by *Mr. Westcott,* for the complainant, and *Mr. Badger,* for the defendant.

Mr. Chief Justice TANEY delivered the opinion of the court The court have considered the above motions.

The motion to authorize the attorney-general of the United States to take testimony, and to conduct the proceedings on behalf of Florida, with the assent of the State, is refused. Each State must conduct its proceedings for itself. Whatever the attorney-general does in the case must be for the United States, and in the name of the United States, and with reference to their interest or duty in this controversy.

The motion on behalf of the State of Georgia, to appoint one or more persons to make the necessary surveys and to report their opinion to the court, is also overruled. Each party is at liberty to cause surveys to be made, and maps prepared and filed, by such person as the State may select, or, if they can agree, they may jointly appoint one. And these surveys and maps, and the proofs applicable to them, will be examined and considered by the court at the hearing, with the other testimony. But the court do not deem it advisable to appoint one or more persons to make these surveys and examinations, as officers of the court; and think the case will be better brought before them by leaving each State to act for itself.

The court, therefore, overrule the motions; and, for the purpose of preparing the case for hearing, make the following order: —

### Final Order.

On consideration of the several motions filed yesterday by the complainant's counsel, and of the arguments of counsel thereupon had, as well in support of as against the same, it is ordered by the court that the said motions be and they are hereby overruled. And it is further now here ordered by the court, that the said parties in said cause be allowed until the first Monday of December, 1855, to obtain, take, and file the testimony and proofs, by said parties respectively to be adduced and given in evidence, on the hearing of said cause; and that, to enable said parties respectively so to do, commissions, in the usual form, be issued by the clerk, to examine witnesses, upon application of either party, accompanied by interrogatories, a copy whereof has been served upon the adverse party, or its solicitor or counsel, twenty days previous to such application, in order that cross-interrogatories may be filed within said twenty days by such adverse party; and that the commissioner or commissioners in each instance, if not agreed upon by the counsel of the respective parties, be named by the chief justice or one of the associate justices of this court; and that, forthwith, on the return of any commission executed, the clerk do open and file the same, and cause the same to be printed for the use of said parties.

And also, that any exceptions to testimony may be taken at the final hearing ; and, if exceptions be then taken to the competency of testimony, which the opposite party can remove by further proof, the court will reserve the decision, and give time to the party to produce it.

And also, that said cause be set for final hearing on the bill, answer, replication, exhibits, testimony, and proofs, so adduced, filed, and admitted, on the second Monday of January, 1856, unless cause be then shown to the court for the continuance thereof.