# JUNE, 1939

GUS S. WORTHAM V. J. H. WALKER, COMMISSIONER GENERAL LAND OFFICE, ET AL.

No. 5689. Decided February 8, 1939.
Rehearing overruled June 7, 1939.
(128 S. W., 2d Series, 1138.)

R. H. Ward, Jno. G. Logue, Andrews, Streetman, Logue & Mobley, E. J. Fountain, Harry R. Jones, Andrews, Kelley, Kurth & Campbell, all of Houston, for relator.

When there is an offer made by an act of the Legislature which is accepted by an individual, there is a contract which is not within the power of the State to impair. White v. Martin, 66 Texas 340; Houston Oil Co. v. McGrew, 107 Texas 220, 176 S. W. 45; Anderson v. Robison, 111 Texas 406, 238 S. W. 833.

Robert Lee Bobbitt, former Attorney General, James V. Allred, former Attorney General, W. W. Caves, and Geo. T. Wilson, former Assistants Attorney General, and E. C. Gray, of Higgins, for respondents.

The land in controversy, prior to March 2, 1929, was in no way a part of the counties named in relator's petition, nor of any of the land districts specified therein, nor did any official surveyor of this State have any authority or power as a surveyor to survey the land in said area, and their acts as well as the field notes based on their surveys are null and void and of no legal force. And the facts alleged by relator in his petition do not show in him any vested right to the land described within the meaning of either Article 1, section 10, paragraph 1 of the Constitution of the United States or of Article 1, section 16 of the Constitution of Texas. Peacock v. Hammond, 6 Texas 544; Cox v. Houston & T. C. Ry. Co., 68 Texas 226, 4 S. W. 455; Thomson v. Baker, 90 Texas 163, 38 S. W. 21; Cruzan v. Walker, 118 Texas 189, 28 S. W. (2d) 908.

MR. SPECIAL CHIEF JUSTICE SAMUELS delivered the opinion of the Court.

This suit is an original proceeding in mandamus, instituted in this Court by Gus S. Wortham, relator, in his capacity as executor and trustee, in and under the will of his father, the late John L. Wortham, deceased, and as trustee, as well, for

the surviving widow and heirs of the decedent, against J. H. Walker in his official capacity as Commissioner of the General Land Office of Texas, and also against J. E. Anderson, Charles Williams, and E. C. Gray, who, as private citizens, set up claims to the land in controversy through grants from the United States Government.

The relator seeks to require the Land Commissioner, through writ of mandamus issuing from this Court, to classify, appraise, and value, as dry grazing lands, certain areas, a part of the public domain, within the Counties of Lipscomb, Wheeler, Collingsworth, Hemphill and Childress, lying west of the 100th meridian, and that such classification and appraisement be made as of the day on which the several surveys were made, that is to say, as of the months of January and April, 1910: further, that the Land Commissioner adopt and accept the classification and valuation of the surveys in question, as made by the County surveyors and District Land surveyors in order that relator, in behalf of the representatives and heirs of the late John L. Wortham, may make application for the purchase of the lands, and thereafter obtain and receive patents therefor.

The Land Commissioner, main respondent, answering through the Attorney General, has admitted of record, with certain reservations hereinafter mentioned, the salient facts, set forth in the petition of the Relator, and has agreed that the questions for decision by this Court are those purely of law. In other words, the Land Commissioner, among other things, admits that the Eastern boundary line between the State of Texas and what is now the State of Oklahoma, is one that extends north from the intersection of the 100th meridian with the south bank of the south fork of the Red River, to the intersection of this Meridian, with Parallel 36 degrees 30 minutes. It is further agreed, however, that this meridian, in its extension, from the south bank of the south fork of the Red River, to the intersection of the parallel above mentioned, was not authoritatively established or its location upon the ground fixed or marked, until the matter had been determined by suit in the United States Supreme Court in the case of THE STATE OF OKLAHOMA V. THE STATE OF TEXAS, 272 U. S. 21, 47 Sup. Ct. 9, 71 L. Ed. 145. Further, that prior to this decision, the boundary line had been regarded by the local authorities of the United States and by the State of Texas and the State of Oklahoma, as having been fixed upon the ground by what was commonly known as the Jones-Brown-Clark line, and that prior to the decision of the United States Supreme Court in the above mentioned case, the State of Texas had not exercised any juris-

dictional police or taxing power in the disputed area, except as to that part formerly embraced within the boundaries of Greer County, and had not granted, sold or otherwise disposed of any lands within such area. Further that during such time, the State of Texas had exercised such powers, and all the usual and ordinary attributes of sovereignty only so far eastward as the line commonly known and designated as the Jones-Brown-Clark Line, except as to the area east of such line which had been embraced within the boundaries of Greer County when Texas was exercising control over the region. Further, that after the running and location upon the ground of the Jones-Brown-Clark Line, sovereignty over such area, under claim of right to do so, was sought to be exercised by the Government of the United States, and of the State of Oklahoma, except as to that part within the 100th meridian embraced within the boundaries of Greer County, but that after the decision of the United States Supreme Court, in what is known as the Greer County Case, had been rendered, complete sovereignty was exercised over such County by the United States Government and by the territory of Oklahoma, and subsequently by the State of Oklahoma, when in 1907 it was admitted into the Union as a State. It was further stipulated in this agreement, that the State of Texas, at no period of time, from the running of the Jones-Brown-Clark Line, in 1859 and 1860, had either before or after the decision in the Greer County Case, recognized or acquiesced in such line as the established boundary on the ground between Texas and Oklahoma, and that this was equally true of the attitude of the United States Government, and of the Government of the State of Oklahoma. Further, that since the passage by the Texas Legislature of the Act of 1903, in which the survey of Kidder was officially recognized, the State of Texas, through its constituted authorities, continued to maintain and contend that the line run by Kidder in 1903, which marked the intersection of the 100th meridian with paralled 36 degrees 30 minutes, correctly located the true intersection of the 100th meridian with the Red River, and properly marked the true boundary line on the east between the State of Texas and the State of Oklahoma.

The respondent, Walker, while admitting in substance, the facts around which the claim of the relator revolves, nevertheless, contends that the claim of relator in the lands, measured by the terms of his petition, should not, in any event, extend to the true meridian, but should stop at the Kidder Line, since the Kidder Line fell short approximately 371.5 feet of

reaching the meridian astronomically located on the ground; and further, that since Survey No. 18, in the petition of relator, includes the bed of the north fork of Red River, which is a statutory navigable stream, and may not be lawfully crossed by or included within a survey, no right or claim on the part of relator to such survey could be lawfully entertained or recognized.

The claim of each of the co-respondents Anderson, Williams, and Gray, is based upon patents issued by the Government of the United States of America, confirmed by the State of Oklahoma, prior to the adjudication of the boundary line by the Supreme Court of the United States in the decision hereinabove set out.

These patents were issued by the Government of the United States before it had been authoritatively determined that the location of the Jones-Brown-Clark Line lay considerably west of the true meridian and at a time when confusion existed in the minds of the authorities concerning the line of the 100th meridian astronomically marked and established on the ground.

It appears from the undisputed facts in the records, that on April 10th, 1910, John L. Wortham, applied to the District Surveyor of the Wheeler Land District for the survey of all the area lying west of the true 100th meridian of longitude. Because of the controversy, then undetermined, respecting the exact boundary line between Texas and Oklahoma—that is the true line of demarcation on the ground of the 100th meridian—the land was described in the application as that body lying east of the Counties of Collingsworth, Childress, and that part of Wheeler County, lying south of the north fork of the Red River.

Proceeding further, on May 10th, 1910, the same applicant, John L. Wortham, having doubts whether certain lands described as in the Wheeler District were therein situated (this subdivision having been created out of the old Clay District) filed his application for survey of all the territory lying west of the eastern boundary of the State, and east of the boundaries of Childress, Collingsworth, Wheeler, Hemphill and Lipscomb Counties, according to the line of the 100th meridian, located by Brown-Jones and Clark, whose delineation on the ground is discussed in a subsequent paragraph of this opinion.

In the case of both applications, the surveys were made as required by law, and the field notes, with the applications, were returned to the General Land Office wthin the prescribed

period of ninety days, accompanied by the classification and appraisement of the surveyors.

The applications were made pursuant to Chapter 103, page 159, Act of the 29th Legislature, April 15th, 1905, at its regular session, as amended by the Act of 1907, providing for the sale and lease of Public School and Asylum lands, brought forward as Article 5432 in the Revised Civil Statutes of 1911. The applications, if valid, fell particularly within the pale of Section 8 of the Amended Act relating to the unsurveyed lands of the public domain.

It is conceded that Wortham, the applicant, duly paid the requisite filing and surveyors fees in connection with his applications of purchase, and also other expense in making the actual surveys, and that his expenditures in the premises amounted to several thousand dollars, or at any rate, under the sworn averments of the petition, to a very considerable sum of money.

The present case is one with an epic past, and is framed in a distinct, historical setting. The notable facts that led by successive stages to the immediate controversy, are intimately bound up in the life of five countries—France, America, Spain, Mexico, and Texas, and unfold a drama of the nineteenth century, in which rulers and statesman acted their part and disappeared. The shift of civilization on this part of the continent from the Spaniard to the Anglo-American is at the bottom of the story and illustrates the course of destiny by which one race shrinks to its own confines while the other spreads to distant lands, and carries with it the precious gift of freedom tempered and restricted by law.

It is essential to a clear understanding of the nature and scope of the questions before the court that the historic background of the dispute be traced, at least in outline, since it concerns nations no less than individual men.

The seeds of this suit were sown in the treaty between the United States and Spain in the year 1819.

Spain had ceded what came to be known as the Louisiana territory to France. This vast area, through the efforts of Mr. Jefferson, was purchased by the United States from Bonaparte's government under the conviction that this territory, thus acquired, bordered on the west of the Rio Grande, and that on the east it extended to the environs of Florida—a viewpoint shared by such public men of that era as Clay, John Quincy Adams, Van Buren and Benton.

Trouble afterwards arose with Spain concerning the boundary of Louisiana, including both western and eastern boundary lines of the ceded territory, which after long and tedious negotiations, resulted in the treaty of 1819.

Under the terms of this treaty, the region known as Florida was relinquished to the United States, while the latter by recession fell back from the Rio Grande to the Sabine as the southwestern frontier, thereby abandoning the territory now embraced within the boundaries of Texas to his Catholic Majestic, the King of Spain.

The provisions of Article 3 of the treaty sought to fix the western boundary of the Louisiana territory, and after defining the boundary line from the mouth of the Sabine to the Red River, it was provided that the line should follow the course of the Red River westward "to the degree of longitude 100 west from London, and 23 from Washington; thence crossing the Red River and running thence by a line due north to the River Arkansas; the whole being as laid down in Mellish's map of the United States, published at Philadelphia, improved up to the first of January, 1818."

Therein lay the mischief, for, as it turned out in after years, this map, in the delineating of the meridian, was entirely faulty and unreliable. If no mention had been made of the Mellish map, all, doubtless, would have gone well, and the error on the ground in the location of the meridian, would in all human probability have been avoided.

When Mexico became an independent state, the provisions of this treaty were ratified in 1828 by a new treaty between the United States and the Republic of Mexico, and thereafter confirmed by the convention of 1838, between the United States and the new Republic of Texas. In consequence of these compacts, the line of boundary set up in the treaty with Spain became the line of demarcation between the Republic of Texas, and the adjacent territory of the United States. However, in the year 1850, after Texas had been admitted into the Union, a compact was made between the United States and Texas (whose northern boundaries until then had extended to the 42nd parallel, 5 1/2 degrees beyond the line of the Missouri Compromise) by which Texas, for the consideration of ten million dollars to apply on her public debt, reduced her northern boundary to latitude thirty-six degrees thirty minutes from its intersection with the 100th meridian, and ceded all beyond that parallel to the government of the United States. The eastern boundary called to ascend the Red River to where the 100th meridian crossed the River as shown by Mellish's map.

In the year 1855 the United States awarded land lying immediately east of the 100th meridian to certain Indian tribes.

The Commissioner of Indian Affairs in 1859 of his own initiative employed A. H. Jones and H. M. C. Brown to survey and mark the line of this meridian from the Red River to the north line of the Indian Reservation, and in 1860 this survey was retraced by John H. Clark.

These surveyors marked the line as they ran it with mile posts, and established an initial monument on the north bank of the south fork of the Red River. This line, as thus laid out, came to be known and still is known as the Jones-Brown-Clark Line.

This survey, as later events clearly developed, proved to be entirely erroneous upon the ground and inaccurate even with reference to the much-discussed map of Mellish.

In the year 1860, the Legislature of Texas organized Greer County, placing within the precincts of this county, all lands lying east of the Jones-Brown-Clark line, and between the North and South forks of the Red River. Texas then began the assertion of the claim that the north bank of the Red River was the dividing line between her territory and that of the United States.

In 1876, Texas created the counties of Lipscomb, Hemphill, Wheeler, Collingsworth, and Childress. SAYLES EARLY LAWS, VOL. 3, PAGE 505.

The eastern boundaries of these counties were intended to touch at the 100th meridian, and since at that time the location of the meridian on the ground by Jones and Brown, was assumed to be correct, the eastern boundaries were designated in the Act by mile posts on the 100th meridian, as located by Jones and Brown.

In the year 1890, by an act of Congress, Oklahoma Territory was carved out of a part of the Indian Territory, bounded on the west and south by the boundaries of Texas, and by the terms of the same act the Congress directed that a suit in equity be prosecuted in the United States Supreme Court against the State of Texas to determine the title to land included in Greer County lying east of the 100th meridian between the forks of the Red River.

Texas, still intent on holding to the 100th meridian, in the year 1892, engaged the services of H. S. Pritchett of the Astronomical Observatory of Washington University, St. Louis, to establish on the ground the intersection of the 100th meridian with the Red River. Pritchett located this intersection at

a point 3797.3 feet east of the original monument established by Jones and Brown.

Following this survey (the United States having meanwhile instituted suit to settle the Greer County Controversy), the United States Supreme Court in the year 1896 handed down its decree on the claims of the two governments. United States v. Texas, 162 U. S. 1, 40 L. Ed. 867.

This decree, as appears from the opinion of the Court in that case and in the subsequent case of Oklahoma v. Texas, did not involve the *location* of the 100th meridian on the ground or any part of the boundary north of the River, "but merely the general questions, whether under the treaty of 1819 the boundary line along the course of the Red River followed the north or south fork, or either of them to the true meridian." Texas had contended before the Court, that as the treaty of 1819 with Spain had declared that the boundary line should be accepted as delineated on Mellish's map, which located the 100 meridian east of the forks (thereby placing the whole disputed area west of the meridian), the correct astronomical location was beside the question, since both governments, Spain and the United States, acted upon the map and not upon the true meridian, and were bound thereby. The Court rejected this argument and held, in effect, that the high contracting parties, signatories to the treaty of 1819, had in mind and intended to be governed by the true meridian regardless of its place upon the map, and neither party should be made the victim of the erratic mathematics of a blundering map maker.

The Court further held that, quite independently of the treaty in view of the Legislative compact of 1850 coupled with the subsequent acts of the two governments, Texas and the United States, the meridian in question must be construed to be the true 100th meridian, and that the course of the Red River westward "must go and was intended to go to the true or actual 100th meridian and not stop at the Mellish 100th meridian." This conclusion is pointed out by Mr. Justice Sanford, in Oklahoma v. Texas, 272 U. S. 21, 71 L. Ed. 145, who in reviewing the case of U. S. v. Texas, supra, made the following comment:

"The Greer County suit was brought by the United States against Texas solely to settle the controversy as to the land in 'Greer County' lying east of the 100th meridian, and between the forks of the Red River. It did not involve any part of the boundary north of the river; nor did it involve, under the issues submitted, the precise location between the two forks,

but merely the general questions whether under the treaty of 1819 the boundary line along the course of Red River followed the North or South fork, or either of them, to the true meridian."

Again in referring to the decree of the Court in United States v. Oklahoma, Mr. Justice Sanford, speaking for a unanimous Court, said:

"And so, while the decree likewise determined that the boundary line between Texas and the territories of the United States followed the line of the true 100th meridian from its intersection with the South fork of Red River it was for like reason not an adjudication as to the precise location of the meridian line, but left this matter open and undetermined."

After the decision of the Federal Supreme Court in the Greer County case, the Secretary of the Interior, pursuant to Act of Congress passed January 15th, 1901, directed Arthur D. Kidder, Examiner of Surveys, to establish on the ground the intersection of the true 100th meridian with the south bank of Red River. Kidder undertook the task and fixed the location on the ground 3699.7 feet east of the Jones-Brown-Clark line and 97.6 feet west of the Pritchett line, and erected a monument at the point of intersection as he, Kidder, defined it, to commemorate the exact location, and bills were introduced in Congress to approve his survey, but it seems no action was ever taken thereon.

In the year 1903, the First Called Session of the 28th Legislature, page 12, Chapter 7, Sec. 2, declared "that the monument established (under authority of the Act of Congress approved January fifteenth, nineteen hundred and one) by Arthur D. Kidder, United States Examiner of Surveys, at the point of intersection of the true one-hundredth meridian with Red River shall be accepted as correct."

Relator's father, Jno. L. Wortham, endeavored in the year 1910 to file on the lands in dispute but the Court of Civil Appeals (Amarillo District) in the case of Wortham v. Sullivan, 147 S. W. 702, denied writ of mandamus holding that the line of boundary between Oklahoma and Texas had not yet been established, and that since the question was one entirely political, it would not compel the surveyor, who had refused to act, to determine a question sovereign in its nature. It is to be noted, however, that where under another application a surveyor had consented to act, and judicial aid was not required for such action, three patents had issued in that very

year from the State of Texas to Wortham, embracing 2002 acres of land out of the disputed strip.

Coming down to the year 1923, another survey was made by United States Coast and Geodetic survey, and this time the line of the 100th meridian was located 371 feet east of the Kidder monument.

Oklahoma was admitted into the Union as a state in the year 1907. The United States had granted to the University of Oklahoma, after statehood had been created, a part of the lands in the disputed area, and by the year 1920, had patented more than 20,000 acres out of this same region to various persons who were purchasers thereof, including the individual respondents herein.

■ Such was the disordered and nubulous condition of claims in the affected territory when, on the 10th of November, 1919, the State of Oklahoma filed its bill of complaint against the State of Texas, in the United States Supreme Court—the only tribunal where such a transcendent issue could be framed—for a judicial determination of the true line that would mark and forever settle the geographical frontier of the most northern-eastern boundary of Texas and the western boundary of Oklahoma.

Following this action on the part of Oklahoma, the State of Texas, pursuant to a Concurrent Resolution, page 462, Second Called Session, 36th Legislature, approved July 24th, 1919, filed a counterclaim as an original bill in equity in the Oklahoma suit, setting up the territorial claims of Texas to the 100th meridian on the ground. That court, on October 11th, 1926, by unanimous decision, speaking through Mr. Justice Sanford, upheld fully the contentions of Texas, and its claim to sovereignty over the disputed strip, adjudging that the boundary of the State extended to the true 100th meridian on the ground extending north from its intersection with the south bank of the south fork of Red River to its intersection with parallel of 36 degrees 30 minutes. (272 U. S. 21, 71 L. Ed., p. 145). The Court, however, discarded all surveys on the ground theretofore made, including the Kidder survey, and directed an entirely new survey to be made. To that end the Court selected and appointed Samuel S. Gannett, geodetic and astronomic engineer, as commissioner to run, locate and mark the boundary line between the two states, as if the question were virgin. (273 U. S. 93-4, 71 L. Ed. 555). Gannett performed the work under the order of the Court and fixed the boundary line where the 100th meridian intersects the south bank of

south fork of Red River 4071.2 feet east of the Jones-Brown-Clark line, and established suitable monuments throughout the entire line in keeping with the decree of the Court. His report was submitted October 14th, 1929, and decree entered by the court on March 17th, 1930, approving the survey as the true boundary line on the ground between the contending states. 281 U. S. 111, 74 L. Ed. 731. The effect of this decree was finally and effectively to include within the territorial borders of Texas all the lands east of what is known as the Jones-Brown-Clark line to the true 100th meridian as established by the Gannett survey.

On March 2nd, 1929, prior to the decision in Oklahoma v. Texas, supra, and, perhaps, in anticipation of the event, the Forty-First Legislature in regular session, Chapter 155, page 355, expressly withdrew from sale the area in dispute, and provided that it should not be disposed of until the Legislature should thereafter direct.

The foregoing recitation is deemed necessary as a narrative of the evolutionary stages leading up to the present suit, and to make clear the discussion of issues of law in the opinion that follows.

It is first contended by the individual respondent that patents to lands in the disputed area issued by the United States government while it was in possession of such territory, have an inherent virtue which through the alchemy of public policy, (since at that time the assertion of ownership by the United States was made under a claim of right) should be permitted to ripen into complete title.

This contention grows out of the de facto jurisdiction asserted at one time by the United States before the true 100th meridian had been marked upon the ground, and when the exercise of police authority by the State of Texas over this area was dormant, pending the final decision of the Supreme Court of the United States.

The mere statement of this argument, when properly analyzed, would seem to carry with it a refutation all its own. Simple good faith, or even honesty of declaration standing alone, can never, in the realm of government, take the place of title as the foundation of ownership or, to use a better term of a right to sovereignty. The State of Texas cannot be estopped to claim title to its own territory by the exercise of unlawful authority over this territory by some other government, or by assumption of sovereignty in which the State of Texas had

no part, and to which the people of the State, in whom the ultimate authority rests, have never consented.

The public domain of Texas is a birthright of the people brought into life at a time when, as a republic, it wrested this territory from the control of Mexico.

The inviolable nature of this supreme ownership was recognized and accentuated in the provisions of the Joint Resolution of the National Congress, adopted March 1st, 1845, under which Texas was admitted into the Union.

It is not only of historic importance, but of decisive value to this question to quote the language of the Resolution applicable to this feature:

"Said state, when admitted into the Union, after ceding to the United States all public edifices, fortifications, barracks, ports and harbours, navy and navy-yards, docks, magazines, arms, armaments, and all other property and means pertaining to the public defense belonging to the said Republic of Texas, shall retain all the public funds, debts, taxes, and dues of every kind which may belong to, or be due and owing to said Republic; and shall also retain all the vacant and unappropriated lands lying within its limits, to be applied to the payment of the debts and liabilities of said Republic of Texas, and the residue of said lands, after discharging said debts and liabilities, to be disposed of as said state may direct; but in no event are said debts and liabilities to become a charge upon the government of the United States." (P. 177, Vol. 4, Sayles Annotated Constitutional History).

The Congress of the Republic of Texas by joint resolution approved June 23rd, 1845, ratified the terms of the National Joint Resolution and submitted the final decision to the deputies of the people of Texas, who in convention in the City of Austin, July 4th, 1845, gave their consent.

■■ When tested by true definition, it could scarcely be said, in the circumstances of this case, that the authority that was sought to be wielded by the government of the United States over the area in dispute was ever that of a de facto government. We understand, under the doctrine of adjudicated cases, that a de facto government is one that maintains itself by a display of force against the will of the rightful legal government, and is successful, at least temporarily, in overturning the institutions of government of the latter by setting up its own in lieu thereof. Thorington v. Smith, 8 Wall. 1, 19 L. Ed. 61; Thomas v. Taylor, 42 Mis. 651, 2 Am. Rep. 625. No such facts are shown to have existed, but the matter in controversy

simply resolved itself into strife over a question of boundary. Moreover, it should be borne in mind that the government of the United States was itself a party litigant to the case of Oklahoma v. Texas, 272 U. S. 21, wherein the question of boundary was finally adjudicated and established, and, as an intervener in that cause, having submitted its rights to the Federal Tribunal, it was forever concluded by the judgment of the only Court that is empowered under our political scheme to pass upon controversies between the States. Rhode Island v. Massachusetts, 37 U. S. (12 Pet.) 657, 9 L. Ed. 1233.

In the early case of Florida v. Georgia, 58 U. S. (7. How.) 478, 15 L. Ed. 181, it was held that where a bill is filed by one State against another to put at rest a question of disputed boundary, the United States has an interest in the controversy, and the Attorney General may intervene in the cause and appear on behalf of the Federal Government.

This was precisely the course followed by the United States in the foregoing case, with the inevitable result that since water cannot rise higher than its source, the title of the individual respondent herein cannot ascent to any greater dignity or validity than the grant through which the claim of title is derived.

Oklahoma, as we have seen, took the initiative in instituting the suit in the Supreme Court of the United States, and having submitted her claims to the arbitrament of that tribunal she, no less than the United States, is bound by the decree. It was aptly said in State v. Zanco's Heirs, 18 Texas Civ. App., 127, 44 S. W. 527, that when a state enters the courts as a litigant, it must be held subject to the same rules that govern the other litigants, and abide the consequences of the suit; and again, as it was said in State v. Cloudt, 84 S. W. 415 that:

"When a state appears as a party to a suit, she voluntarily casts off the robes of her sovereignty, and stands before the bar of a court of her own creation in the same attitude as an individual litigant; and her rights are determined and fixed by the same principles of law and equity, and a judgment for or against her must be given the same effect as would have been given it had it been rendered in a case between private individuals."

While Texas is a part of the Union, and one of the States forming the league, happily for our people the United States government as such holds no better position in a claim of title to the public domain of this State than a foreign government across the seas. If respondents have been misled or dam-

aged through a mistaken assertion of sovereignty by the Government of the United States, then the appeal for recompense should be addressed to that government and none other, and, probably, if meritorious such appeal would not be suffered to go unheeded.

There is a striking resemblance between the historical attitude of this case and that of some of the claimants in the case of Kenedy Pasture Co. v. State of Texas, 111 Texas 200, 231. S. W. 683. There it was asserted that Texas had lost sovereignty over the territory between the Nueces and Rio Grande rivers because it had remained largely in the actual physical possession of Mexico, and, under its claim of jurisdiction until 1846. In that case, as in this, it was but a de facto possession, which came to an end when in the year 1846, this area was occupied by the American solidery on behalf of Texas, and jurisdiction was again directly exercised over the debated region by the State of Texas. Here, as we view it, is a status that may be likened to that controversy. Through a decision and decree of the supreme arbiter, in such altercations, under the Constitution of the United States, the title of Texas to this domain was upheld and sustained, and that, too, upon no narrow Al Sirat of technical refinement, but upon the fundamental right of title and the sovereignty that goes with it. Chief Justice Phillips in the Kenedy case touches the deep note in the gamut of the case when he declares:

"With no right at all to this territory after 1836, it would be strange to admit the sovereignty of Mexico over it in 1848, when two years before the sovereignty of Texas had been perfected by reducing the territory to possession. It is equally anomalous to contend that in 1848 Mexican de facto possession of it continued, when in 1847 the entire country, with its capital, was in the hands of American troups and the defeat of Mexico an accomplished fact."

Then again the same learned Judge proclaims this principle, that lies imbedded in the present case:

"Considerations of policy and justice of course require of a de facto government the preservation of order and the adjustment of private rights and claims between individuals. For this reason the acts of the de facto government in actual possession of disputed territory in the ordinary administration of its laws, in so far as they affect private rights, are valid. Its acts affecting public rights, however, are void, since they are necessarily in derogation of the rightful, the de jure, sovereignty. The granting of the public domain is, of course, an

Act affecting public rights. It has never been otherwise considered. Titles to land in ceded or even conquered territory acquired from a former sovereignty when it had the right to grant them are of course valid, even as against the succeeding sovereignty. But it is plain that this rule cannot apply to a grant of land in territory to which the sovereignty issuing the grant had at the time no right, even though it was in possession. If the sovereignty had no right to the territory, its possession was not rightful. An unlawful, even though an actual possession of land, cannot confer the power of disposing of the title. This is as true of nations as it is of individuals. In cases of disputed territory, when the true boundary is ascertained or adjusted by agreement, grants made by the unlawful sovereignty in the territory to which as thus ascertained it had no right, whether it had possession at the time of the grants or not, unless confirmed by express agreement, fail and are of no effect against the sovereignty to which the territory of right belonged. They fail simply because of want of title in the grantor. A de facto possession cannot supply the title. These principles are well established and are a part of the accepted law of nations. Coffee v. Groover, 123 U. S. 1, 31 L. Ed. 51.

"Not only is a grant of land void where a part of territory to which the sovereignty making it had at the time no lawful right, even though it was in possession, but certainly after the signing of a treaty which recognizes the superior right of the opposing sovereignty, its power of granting away the territory is at an end. If its possession is not rightful, clearly its jurisdiction can obtain only for strictly municipal purposes. Until actual delivery of the territory it subsists for those purposes alone—to preserve the public order, the settlement of disputes between individuals and the like. But after the signing of the treaty its powers of sovereignty except strictly for those purposes, cease. It distinctly had no power to grant land or franchise. Such a power is one of the highest attributes of sovereignty, and its exercise would necessarily operate as a denial of the rights of the succeeding sovereignty. Davis v. Police Jury, etc. 9 Howard, 279, 13 L. Ed. 138; Trevino v. Fernandez, 13 Tex. 664."

It is peculiarly appropriate to this discussion, inasmuch as it includes, as we conceive it, a Federal question, to refer to a leading case in the reports of the United States Supreme Court, which is the foundation stone in support of the chief doctrine of the Kenedy case. The case in mind is that of Coffee

v. Groover, 123 U. S. 1, 31 L. Ed. 51. A conflict had arisen over a tract of ninety-seven acres of land that lay between the boundary line of the states of Florida and Georgia. Suit was instituted in the Florida State Court, the plaintiff claiming title through the State of Georgia, the defendant under a grant made by the United States to Florida and by the latter state to the defendant. The Supreme Court of Florida awarded the title to the plaintiff who had derived his right through the conflicting grant from the State of Georgia.

On the hearing of the case in the trial court it was developed that the people living in the disputed region had always treated landed property as within the territory of Georgia, and for a long period of years had acted on this belief by paying their taxes to the Georgia authorities and probating wills affecting title to such lands in the Courts having probate jurisdiction within the State of Georgia, and that control and possession of the region, wherein the particular tract was situated, had been exercised and held by the official authorities of the State of Georgia. Error was prosecuted to the Supreme Court of the United States.

The latter court in reviewing the decision of the Supreme Court of Florida, and in commenting on the Florida decision said:

"The position assumed is that grants in a disputed territory, by a government exercising therein sovereign jurisdiction de facto, are valid and to be sustained, notwithstanding that, by a subsequent settlement of boundaries, the disputed territory is conceded to the other contesting sovereign."

The Court, then by way of further review of such premise, made this observation:

"It is then assumed that, in cases of disputed boundaries, where a line is finally fixed by compromise, the position of territory previously possessed by either of the contracting parties, and conceded by the adopted line to the other, are to be regarded and treated as ceded territory, and not as territory that always really belonged to the sovereign who gets it by the compromise. The Supreme Court of Florida speaks of the decision of the lower court, which it affirmed, and says: 'What they did decide was, that grants by a government de facto of parts of a disputed territory in its possession are valid against the state which had the right; and that, when a territory is acquired by treaty, cession, or conquest, the rights of the inhabitants are respected and sacred.'"

The court, preceeding with the analysis of the decision of the Supreme Court of Florida, then declares the rule of law respecting the doctrine of private rights in ceded territory:

"It is no doubt the received doctrine, that in cases of ceded or conquered territory, the rights of private property in lands are respected. Grants made by the former government, *being rightful when made*, are not usually disturbed. Allegiance is transferred from one government to the other without any subversion of property. This doctrine has been laid down very broadly on several occasions by this Court,—particularly in cases arising upon grants of land made by the Spanish and other governments in Louisiana and Florida before those countries were ceded to the United States."

Proceeding further the Court then clarifies the atmosphere of the broad doctrine with the vital qualification that now follows:

"But whilst this is the acknowledged rule in cases of ceded, and even conquered territory, with regard to titles acquired from a former sovereign who had undoubted right to create them, it does not apply (as we shall see) to cases of disputed boundary, in relation to titles created by a sovereign in possession, but not rightfully so. In the latter case, when the true boundary is ascertained, or adjusted by agreement, grants made by either sovereign beyond the limits of his rightful territory, whether he had possession or not (unless confirmed by proper stipulations), fail for want of title in the grantor."

The reviewing court then proceeds again to touch the very key to the question under discussion in the present case, by stating in clear and simple terms the principle that should govern in such a controversy:

"The case, then, stands upon the original validity of the Georgia grants; and the question may well be asked, how does a landholder who obtains title from a sovereign that has none stand in any better position than one who obtains title from an individual that has none? Georgia had no title to the land. Previous and subsequent historical events abundantly show this. Her grants have nothing to rest on but her actual possession of the disputed territory and her exercise of government de facto therein."

As if to conclude the argument and bring it to a close, the reviewing Court then expresses its viewpoint in language germane to the case before us:

"In Garcia v. Lee, Chief Justice Taney expressly argues that, in a case of disputed boundary, titles must stand or fall with the government creating them. His language is: 'Indeed, when it is once admitted that the boundary line, according to the American construction of the Treaty, is to be treated as the true one in the courts of the United States, it would seem to follow, as a necessary consequence, that the grant now before the Court, which was made by the Spanish authorities within the limit of the territory which then belonged to the United States, must be null and void; unless it has been confirmed by the United States by treaty or otherwise. It is obvious that one Nation cannot grant away the territory of another; and if a proposition so evident needed confirmation, it will be found in the case of Poole v. Fleeger (supra). In that case there had been a disputed boundary between two States and the parties claimed the same land under grants from different States. The boundary line had been ascertained by compact between the States after the grants were made. And in deciding between the claimants in that case, the Court said: 'In this view of the matter it is perfectly clear that the grants made by North Carolina and Tennessee, under which the defendant claimed, were not rightfully made, because they were originally beyond her territorial boundary; and that the grant under which claimants claim was rightfully made, because it was within the territorial boundary of Virginia." And again, "If the States of North Carolina and Tennessee could not rightfully grant the land in question, and the States of Virginia and Kentucky could, the invalidity of the grants of the former arises, not from any violation of the obligation of the grant, but from an intrinsic defect of title in the States." ' "

Respondents advance the thesis that the exercise of de facto jurisdiction over the nondescript region by the United States and grants made thereunder by that government during that period of time give to the issue purely a political aspect which the Courts may not disturb or bring under review.

The case of Cameron's Exrs. v. State, 95 Texas 545, 68 S. W. 509, is cited as authority for this position. The distinction between that case and this is manifest. The lands involved in the Cameron case consisted of tracts in Hockley and Cochran Counties that had been granted in the year 1887 for school purposes to Greer County, then regarded as a part of the original territory of Texas. The award was made under the general laws of Texas, granting four leagues of land to each County of the State for school purposes. Suit was brought

by the State against the heirs of Wm. Cameron, deceased, and and Greer County, Oklahoma to recover title to the lands, upon the theory that since the United States Supreme Court had denied the claims of Texas to Greer County, the grant of such lands to that County, and their subsequent sale rendered the title void in the hands of Cameron and his assigns. The State of Oklahoma voluntarily appeared in Court and made itself a party defendant in the cause.

The Court held that the Legislature had expressly permitted the award and had then recognized Greer County as an integral part of the State of Texas, and since this was an act political in its nature, the Courts were bound by such action and were precluded from gainsaying its legal effect.

The situation in this case is quite the reverse. Texas has never conceded the claim of the United States government or that of Oklahoma to the lands lying west of the 100th meridian, nor has the political branch of its sovereignty made any such concession. From the year 1860, when Texas organized Greer County, and prior thereto, successively, step by step, Texas has contended for the 100th meridian as the most northern-eastern boundary of Texas, and the western boundary of Oklahoma. In fact, bearing in mind historical and judicial evidence, as we have seen in the Greer County Case, the claim of territory on the part of Texas went even farther than this. Texas claimed not only to the 100th meridian, as it was subsequently located on the ground by the Gannett survey, but to such meridian as depicted on the Mellish map, which contention carried the claim eastward eighty or ninety miles beyond the meridian on the ground. In purchasing lands from the government of the United States in what is now the State of Oklahoma, the private respondents relied upon the claim of title asserted by the United States, and not through any cession or recognition of such title by the political or executive branch of the government of Texas. The Cameron case and those cases like it, cited by respondents are entirely beside the issue in this cause, and have no application to the judicial features of this controversy.

■ If the preceding questions were the only points at issue, the path to a conclusion favorable to Relator would be relatively straight and unhindered. But grave principles of public policy and impressive canons of statutory construction, as we conceive the case, stand in the way of this easy consummation. At this stage it becomes us to say that we are not unmindful of the line of precedent, uniform and unbroken, which holds

that where the applicant has complied with all the antecedent requirements for the purchase of some part of the public domain which the State has offered for sale, the right to purchase becomes vested in the applicant. This is a rule of property and of contract which we should sustain even if it were not already firmly imbedded in our decisions. White v. Martin, 66 Texas 344, 17 S. W. 727; Jumbo Cattle Co. v. Bacon & Graves, 79 Texas 12, 14 S. W. 840.

As it comes before us in this record, the challenge to Relator is not in his fulfillment of the various steps required to meet the offer of the State, but first, whether the lands in controversy were properly on the market for sale; and next, where the Commissioner of the General Land Office has acted in a case involving dubious considerations in which the faculty of discretion is required to be exercised, may this Court on an original petition for mandamus—a writ imperative in its nature—revise or reverse such action and coerce a contrariwise decision?

The determination of either question adverse to the position of Relator is fatal to his cause.

We shall examine each question in its due and proper setting, although one shades, more or less, by imperceptible degrees, into the other.

Before the region in which this area lies had been finally adjudged to be the territory of the State of Texas, sovereignty was admittedly in dispute, albeit the Government of the United States, the Territory of Oklahoma, and subsequently Oklahoma as a State, in practice asserted police and taxing authority over all the lands embraced in the claim of petitioner. It is seen that at the very moment of time when petitioner presented his application and filed on the land, the activities of the taxing power and of police regulation by the State of Texas in the disputed region, had lain dormant—in truth the very form and semblance of dominion by the State or by County Officers of Texas had disappeared. None knew what political destiny awaited it until the Supreme Tribunal had spoken. Surveys had differed, frontiers fluctuated, and boundaries advanced and receded.

This hapless confusion met with judicial recognition in the case of Wortham v. Sullivan, 147 S. W. 702, decided by the Amarillo Court of Civil Appeals in 1912, in which this Court refused writ of error. That suit in its essential structure was the same as here, save that it was filed in the District Court of Childress County.

■ John L. Wortham (in whose stead Gus S. Wortham, Relator herein, acts as son and successor) was the petitioner in mandamus. It was sought therein to require Sullivan, as County Surveyor of Childress County, to make a survey of approximately 5000 acres of land belonging to the public free school fund of the State. Allegation was made of all things requisite to compel a survey in the event the land lay in Childress County. Sullivan answered setting up the political and boundary conditions as we have sketched them in this discussion. The trial court refused the writ and on appeal this action was sustained by the Court of Civil Appeals. In holding to this viewpoint, the court said, among other things:

"The undisputed facts show that the State of Texas is not exercising sovereignty over any part of the territory involved in this controversy, and it clearly was not the duty of the county surveyor to make a survey of lands in territory which the political powers of the state now recognize as lying beyond its limits."

Continuing, the court declared, in passing on the very heart of the contention, this wholesome doctrine which we have yet to see confuted:

"The law is well settled that mandamus will not lie to compel the performance of an act by an official unless his duty to perform the same is so clear and free from doubt as not to require the exercise of discretion on his part, and so that its performance amounts to a mere ministerial act."

It may be argued that since the Legislature did not affirmatively withdraw the lands from sale until March, 1929, its failure to act prior to that time should be construed as acquiescence in the sale.

■ The explanation is not to be held to such narrow considerations. Statutes are frequently declaratory of conditions already existent and of which the Courts take judicial heed. This is one instance where the Legislature acted in matters in which the Courts in the absence of prohibition would act regardless of legislative direction. It does not follow that because the Legislature was tardy in lifting its voice in protest that such lands were in a legal status to be sold. The authorities of the State had renounced hope of reclaiming the dislocated region.

Relator takes comfort in the assertion that the Act of 1900 providing for sale of the unappropriated public domain permitted the sale of lands in the conflicting area since such

area was not in terms excluded from the scope of the Act. A literal interpretation of a statute which denies to it the historical circumstances under which it was drawn is to make mummery of its provisions.

■ A statute should not be construed in a spirit of detachment as if it were a protoplasm floating around in space. The historical treatment to which a statute may be subjected is aptly set forth in Travelers Insurance Co. v. Marshall, 124 Texas 45, 76 S. W. (2d) 1012, par. 7, where it is said:

"Generally it may be said that in determining the meaning intent, and purpose of a law or constitutional provision, the history of the times out of which it grew, and to which it may be rationally supposed to bear some direct relationship, the evils intended to be remedied, and the good to be accomplished, are proper subjects of inquiry."

Again, it was declared in Board of Insurance Commissioners v. Sproles Motor Freight Lines, 94 S. W. (2d) 775, Par. 8, (writ refused) where the apparent language clashed with the intent—

"In our construction of this statute, we have endeavored to ascertain the legislative intent, based upon well-settled rules of statutory construction. One of the earliest rules for our guidance was announced by the Supreme Court in the case of Russell v. Farquhar, 55 Tex. 355, in the brief statement, 'It the duty of the court 'to try out the right intendment' of the law,' which rule has been many times quoted and followed and even broadened by adding to the above-quoted clause, 'and, when found, to observe and follow it though there may be a conflict between its intent and words.' "

The policy of the State is inevitably drawn into the fabric of a statute as profound and as far-reaching as the one under consideration. This policy is as clear, when viewed in its traditional light, as if it had been stamped on the language of the Act itself.

It is said in Holy Writ that the letter killeth but the spirit giveth life. Here it is so.

The devotion we owe to the public welfare, as that welfare is interwoven in the texture of the law and framed in unforgettable precedents impel us to determine this question as it is presented in this record against the contention of the relator.

Law is not a water-tight compartment sealed or shut off

from contact with the drama of life which unfolds before our eyes. It is in no sense a cloistered realm but a busy stage in which events are held up to our vision and touch at our elbows.

We cannot disengage this controversy from the historic framework in which the facts are enclosed.

This is not an ordinary suit between private litigants. It is an extraordinary proceeding to invoke the aid of this Court through a summary and inexorable writ to compel an officer of the State to part with a vast quantity of the public domain and to classify it in such way as to make its price sacrificial and inimical to the public welfare.

■ The rule concerning the certainty of averments in petition for mandamus is lucidly expressed by Ferris in his work on Extraordinary Legal Remedies, page 228, Section 194, wherein it is declared:

"Relator, to be entitled to the right, must at least have a clear legal right to the performance by respondent of the particular duty sought to be enforced, that is, there must be a clear legal right in relator and a corresponding duty on the part of the person to whom the writ is directed. No intendments are to be indulged. Relator must by averment and proof show an unqualified right to the writ . . . Absent any clear legal right of relator which it is the duty of respondent to grant, there is no substantial resting place upon which to base the application, for in its final analysis the question for determination is whether the right of the aggrieved party is so free from doubt and the duty of the officer so clear and free from any substantial question that an order should issue to compel performance. The office of mandamus is to execute, not adjudicate. It does not ascertain or adjust mutual claims or rights between the parties. If the right be doubtful, it must be first established in some other form of action. Mandamus will not lie to establish as well as enforce a claim of uncertain merit."

To the same effect are the cases of Holcomb v. Robison, 118 Texas 395, 15 S. W. (2d) 1027, 1028; Taliaferro v. Hale, 47 S. W. (2d) 340, 341, and other cases numerous in our decisions.

■ It is our conclusion that since the burden lay upon the Relator to make an unequivocal showing, this Court is without power to convert a writ of mandamus into an adjudication of a doubtful claim. Mandamus is a writ which issues to require

the execution of a matter whose merit is beyond dispute, and may not be employed as scales in which to balance the weight of evidence or to bridge the gap between broken or disconnected facts.

We are therefore constrained to deny the petition of Relator and refuse the writ, and it is accordingly so ordered.

Chief Justice Cureton disqualified and not sitting.

Opinion adopted by the Supreme Court, Feb. 8, 1939.

Rehearing overruled June 7, 1939.