

## Office of the Attorney General
### State of Texas

DAN MORALES
ATTORNEY GENERAL

April 20, 1992

Mr. Larry E. Kosta
Executive Director
Texas Department of Licensing
and Regulation
P. O. Box 12157
Austin, Texas 78711

Opinion No. DM-110

Re: Whether section 11(b) of the Texas Boxing and Wrestling Act, V.T.C.S. article 8501-1, applies to cable television companies collecting pay-per-view fees from subscribers viewing live telecasts of professional boxing performances (RQ-208)

Dear Mr. Kosta:

The Texas Boxing and Wrestling Act (the act), V.T.C.S. article 8501-1, requires the Texas Department of Licensing and Regulation (the department) to collect a three percent gross receipts tax on admission fees charged to view a boxing match, contest, or exhibition conducted in Texas or shown on closed circuit telecasts in Texas. V.T.C.S. art. 8501-1, § 11(a), (b). Section 11(b), which applies specifically to persons charging admission fees for exhibiting a live telecast of a boxing match on closed circuit television, also requires such persons to acquire a boxing promoter's license and to obtain a permit for each closed circuit telecast shown in Texas. Section 11(b) of the act states:

> Any person who charges an admission fee for exhibiting a simultaneous telecast of any live, spontaneous, or current boxing match, contest, or exhibition on a closed circuit telecast must possess a boxing promoter's license issued pursuant to this Act and must obtain a permit for each closed circuit telecast shown in Texas. The [three percent] gross receipts tax ... is applicable to said telecast, and the boxing promoter shall furnish to the department within 72 hours after the event a duly verified report on a form furnished by the department showing the number of tickets sold, prices charged, and amount of gross receipts obtained from the event. A cashier's check or money order

> made payable to the State of Texas in the amount of the tax due
> shall be attached to the verified report.

The state deposits the money it receives as a result of the gross receipts tax into the General Revenue Fund. V.T.C.S. art. 8501-1, § 11(c). You request our opinion as to whether section 11(b) applies to cable television companies that collect from their subscribers special pay-per-view fees, entitling each paying subscriber to watch a simultaneous telecast of live boxing matches. If section 11(b) does apply to pay-per-view cable television companies, each pay-per-view cable television company offering simultaneous telecasts of live boxing matches must acquire a promoter's license, obtain a permit, and pay the three percent gross receipts tax. The ultimate issue is whether "admission fee," as section 11(b) of the act uses that term, includes the special pay-per-view fees cable television subscribers pay to cable television companies for the privilege of viewing simultaneous telecasts of live boxing matches.[1]

Former article 614-1 of the Texas Penal Code was the predecessor statute to article 8501-1, V.T.C.S. *See* S.B. 34, Acts 1973, 63d Leg., ch. 399, § 5, at 995, 996b. The Texas Court of Civil Appeals, in a case involving former article 614-1 stated that the article "strictly regulated" boxing activity, that is, the article was designed to control all aspects of the professional boxing industry in Texas. *Harvey v. Morgan*, 272 S.W.2d 621, 622 (Tex. Civ. App.--Austin 1954, writ ref'd n.r.e.). While the legislature has amended former article 614-1 of the Penal Code and its successor, article 8501-1, V.T.C.S., since the Court of Civil Appeals decided *Harvey*, the current statute continues to strictly regulate boxing in the State of Texas. *See* V.T.C.S. art. 8501-1, § 2.

Principles of statutory construction require us to construe statutes in such a manner as to accomplish the legislative intent. Attorney General Opinions M-119 (1967) at 2 (quoting 53 TEX. JUR. 2d *Statutes* § 134, at 195-6 (1964)); M-156 (1967)

---

[1] We found conflicting authorities on whether the term "closed circuit telecast," as it is used in section 11(b) of the act, can be construed to include "cable television," as the consuming public understands the term "cable television." *Compare* E. Foster, UNDERSTANDING BROADCASTING 38, 455, 456 (1979) (defining and discussing closed circuit television and cable television) and WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 193, 250 (1987) (defining "cable," "cable television," and "closed circuit") *with Showing of Sports Events*, 34 F.C.C.2d 271, 280 para. 36 (1972) (distinguishing closed circuit television from subscription cable television for purposes of anti-siphoning rule). As we can decide the issue you present on the basis of the meaning of the term "admission fee," we do not discuss whether "closed circuit telecast" can be construed to include pay-per-view telecasts.

at 1-2 (citing *Independent Life Ins. Co. of Am. v. Work*, 124 Tex. 281, 77 S.W.2d 1036 (1934)).   We must continually bear in mind, however, that statutes should be construed in light of the evil the legislature sought to avoid by enacting the statute. Attorney General Opinion WW-516 (1958) at 3 (citing *Wortham v. Walker*, 133 Tex. 255, 128 S.W.2d 1138 (1939); *Texas & N.O. R.R. Co. v. Railroad Comm'n*, 145 Tex. 541, 200 S.W.2d 626 (1947); 34 TEX. DIGEST *Statutes* § 184); *see also* Attorney General Opinion M-119 at 3.  Here, while the act's statement of purpose indicates a legislative intent strictly to regulate the boxing and wrestling industry in this state, we have found no legislative history indicating the evil the legislature designed article 8501-1 or its predecessor to constrain.  Furthermore, we have found no legislative history indicating either the legislature's understanding of the terms "admission fee," as it used the term in section 11(b) of the act, or the evil the legislature seeks to avoid by taxing admission fees to closed circuit telecasts.  Thus, we must construe "admission fee" solely on the basis of the plain language of the statute.

When construing a statute, we presume that the legislature used words and phrases in the sense in which they are commonly understood.  *See* Gov't Code § 311.011(a); 67 TEX. JUR. 3d *Statutes* § 132, at 737 (1989).  The phrase "admission fee" is commonly understood to connote a sum of money one pays to enter a place, such as a theater, an arena, or a concert hall.  *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 57 (1987) (defining "admission").  In common usage, "admission fee" does not connote a sum of money one pays to view a movie, concert, or sporting event on one's own television, sitting in one's own home.  In our opinion, to construe "admission fee" as it is used in section 11(b) of the act to include pay-per-view fees goes beyond liberally construing the statute; rather, it tortures the plain language of the subsection to construe the term in this way.

Accordingly, as far as we can ascertain the legislature's intent, the legislature enacted section 11(b) to impose a tax only on fees people paid to enter into a place for the purpose of viewing a simultaneous closed circuit telecast of a live boxing performance.  We note that pay-per-view telecasts of live boxing matches were unavailable in 1977, when the legislature added section 11(b) to the act to impose a gross receipts tax on admission fees paid to view closed circuit telecasts of live boxing matches.  Thus, at the time the legislature added section 11(b), it may not have contemplated that pay-per-view telecasts one day would be available. Consequently, we conclude that pay-per-view fees are not subject to the three percent gross receipts tax on admission fees imposed by section 11(b) of the act, and

cable television companies need not acquire a boxing promoter's license and obtain a permit for each telecast of a live boxing performance.

## S U M M A R Y

Cable television companies collecting a special pay-per-view fee from subscribers who wish to view a simultaneous telecast of a live boxing performance are not subject to V.T.C.S. article 8501-1, section 11(b).

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Deputy Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

MADELEINE B. JOHNSON
Chair, Opinion Committee

Prepared by Kymberly Oltrogge
Assistant Attorney General